**Trizah HAWES, et al., Appellants,**

**v.**

**Maureen CHUA, et al., Appellees.**

**No. 99–CV–1028.**

District of Columbia Court of Appeals.

Argued Jan. 18, 2001.

Decided March 29, 2001.

Joseph Cammarata, with whom Ira Sherman, Washington, DC, and Barry I. Buchman were on the brief, for appellants.

Alfred F. Belcuore, for appellees.

Before SCHWELB, FARRELL and REID, Associate Judges.

REID, Associate Judge:

■ In this medical malpractice action relating to the fetal death of twins, the jury returned a verdict for appellees Maureen Chua, M.D., Maureen Chua, M.D., P.C., and Carin Kleiman, M.D. Appellants Trizah Hawes and Derrick Hawes filed a timely appeal, alleging several trial court errors, including the failure of the trial judge to strike the standard of care testimony of defense witness, Dr. Charles F. Hill, Jr. We affirm the judgment of the trial court and conclude, in part, that the trial court did not commit manifest error in admitting Dr. Hill's national standard of care testimony, since that testimony: (a) reflected some evidence that it was based on a national standard, and (b) was

grounded on neither the expert's personal opinion, nor mere speculation or conjecture. We emphasize the closeness of this case, however, and reiterate that it is insufficient for a defense expert's standard of care testimony to merely recite the words "national standard of care."

■ We also conclude that the trial court did not abuse its discretion by: (1) declining to remove a juror during the second week of trial because he recognized a defense expert who was a radiologist in a hospital emergency room ten years ago when the juror was an x-ray technician in the same hospital emergency room, and refusing to strike two jurors for cause during the *voir dire* process; (2) denying appellants' motion to strike the testimony of Dr. Chua as a sanction for her violation of the rule on witnesses; and (3) disallowing cross-examination of a defense expert as to financial bias based on commonality of insurance coverage between the expert and one of the defendants. Accordingly, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The record before us reveals the following pertinent facts. On December 25, 1994, Mrs. Hawes gave birth to stillborn identical twins by emergency C-section. The twins had died *in utero* one to two days earlier. One of appellants' experts, Dr. Janice Marie Lage, Vice Chairman of the Department of Pathology and Professor of Pathology, with expertise in obstetrical and perinatal pathology, at the Georgetown University Medical School, attributed the twins' death to twin-to-twin transfusion syndrome, which in essence, means that one twin was drained of fluid by the other, and the second twin suffered from fluid overload from the first twin.[1]

1. The twins shared a single placenta and a single fetal sac; thus, they fed off of one food

The case centered on the proper course of care and treatment for identical twins exposed to a risk of twin-to-twin transfusion syndrome, as well as a risk of intrauterine growth retardation. Dr. Chua initially provided care for Mrs. Hawes, who was diagnosed with the twin pregnancy on July 18, 1994. By November 1994, Dr. Chua's associate, Dr. Kleiman had assumed primary responsibility for Mrs. Hawes' care.

On November 29, 1994, when the twins were about 31 weeks into their fetal development, an in-office sonogram suggested that they were not developing properly when compared with a November 16th sonogram. A December 6th sonogram, performed at 32 weeks of growth by the Washington Radiology Associates, continued to show growth problems for the twins; they were getting smaller. No decision was made to hospitalize Mrs. Hawes or to deliver the babies, despite the results of the December 6th sonogram.[2]

A complete biophysical profile, including a sonogram, was ordered on December 13th. However, the complete biophysical profile was never done.[3] Dr. Kleiman became concerned for Mrs. Hawes' pregnancy and arranged for home uterine contraction monitoring. Dr. Kleiman also prescribed a medication, terbutaline, to prevent premature contractions. When the monitoring device showed a lot of contractions, Mrs. Hawes was told to return to Dr. Kleiman's office on December 15th. On that day, she complained of pain, and another in-office sonogram was done.

Mrs. Hawes was not hospitalized, and the twins were not delivered. After December 15th, no other sonogram was performed in-office, or by the Washington Radiology Associates.[4]

When Mrs. Hawes arrived at the emergency room of the Washington Hospital Center on December 18th, complaining of continued cramping, pain and irregular contractions, Dr. Kleiman directed Mrs. Hawes to return home and to continue taking the terbutaline to prevent premature contractions. During her December 20th visit to Dr. Kleiman's office, she complained of a reduction in fetal movement, and was placed on a fetal heart monitor. No sonogram was performed, and she was sent home.

On December 25th, Mrs. Hawes called the home fetal monitoring service and informed them that she was experiencing decreased fetal movement. Dr. Chua called Mrs. Hawes back and told her to go to the hospital immediately. A sonogram revealed that both fetuses had died.

In their lawsuit against the appellees, Mr. and Mrs. Hawes maintained that the November and December sonograms showed the early warning signs of trouble for the high-risk twin pregnancy, including a size discrepancy between the twins and a deficit of amniotic fluid around one of the twins; that a sonogram should have been done on December 20th; that the signs of premature labor should have been interpreted as signs that the twins were in distress and were trying to be born; and that the twins should have been delivered

source. This monochorionic pregnancy presented a higher twin pregnancy risk.

2. By the 28th or 29th week of growth, the twins were considered viable.

3. For example, the in-office sonogram was incomplete, and fetal weight and other measures of fetal growth were not done.

4. Dr. Chua considered the "official" or "formal" sonogram conducted by the Washington Radiology Associates to be more reliable than an in-office sonogram; and had sent Mrs. Hawes to Washington Radiology on August 31, 1994, for an "official" sonogram.

sometime earlier since they were past the stage of viability during the period beginning around mid-November.

After the jury returned a verdict in favor of the appellees, Mr. and Mrs. Hawes moved for a new trial, which ultimately was denied. Their appeal followed.

## ANALYSIS

We turn first to appellants' argument that the testimony of Dr. Charles F. Hill, Jr., appellees' expert witness regarding the standard of care owed to Mrs. Hawes, should have been struck by the trial court, because he failed "to provide any basis for his opinion as to the national standard of care." Appellees argue that the trial court did not abuse its discretion in deciding not to strike Dr. Hill's testimony, because, "[a]s the [trial] [c]ourt ... noted, there was no need to recite the mantra of 'national' in each and every question and answer...."

■ "'The trial judge has wide latitude in the admission or exclusion of expert testimony, and his [or her] decision with respect thereto should be sustained unless it is manifestly erroneous.'" *In re Melton*, 597 A.2d 892, 897 (D.C.1991) (quoting *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989)). "Nevertheless, the judge's discretion is not without constraints." *Coates, supra*, 558 A.2d at 1152. One of the constraints is that the exercise of discretion must be based upon correct legal principles. *See District of Columbia v. Sierra Club*, 670 A.2d 354, 361 (D.C. 1996) ("A permissible exercise of discretion must ... be founded upon correct legal principles.") (citation omitted).

To determine whether the trial judge's decision not to strike the testimony of Dr. Hill was "manifestly erroneous," or based upon incorrect legal principles, we first set forth the pertinent factual background.

During his trial testimony, Dr. Hill revealed that he was licensed in the District of Columbia, Maryland, and Virginia; and had a practice in obstetrics and gynecology. A graduate of Mount St. Mary's College in Emmitsburg, Maryland (1969), and Georgetown University Medical School (1975), Dr. Hill completed his residency in 1978 at Georgetown Hospital. He was board certified at the time of trial, presumably in obstetrics and gynecology, and served as an associate clinical instructor at Georgetown.

Before being accepted by the trial court as an expert in the areas of obstetrics, gynecology, management of twin pregnancies, and evaluation of intrauterine growth retardation, and twin-to-twin transfusion syndrome, Dr. Hill responded to the following questions:

Q. Do you make efforts to keep up with the state of the medical art, obstetrics and gynecology?

A. I do.

Q. Are you, sir, in the course of medical education, residency training, overall medical education and experience, familiar with twin-to-twin transfusion syndrome?

A. I have seen it years ago and certainly read about it.

Q. Are you familiar, Dr. Hill, with the standards of care that would apply to the ordinary and reasonable OB/GY [obstetrician and gynecologist] in the management of twin pregnancies and in the evaluation of such patients for IUGR [intrauterine growth retardation] and TTS [twin-to-twin transfusion syndrome], as it existed in 1994?

A. I am.

In providing this background information, Dr. Hill did not mention any textbooks, journal articles, or national professional meetings he had attended, pertaining to

the specialty areas for which he was qualified to testify.

Before stating his professional opinion, Dr. Hill indicated that he reviewed the medical records of Mrs. Hawes, and the depositions of Doctors Chua and Kleiman; as well as the deposition of Dr. Joel Palmer, appellants' standard of care expert. After revealing this information, Dr. Hill was asked:

, Based upon all that you [have] reviewed, Dr. Hill, have you been able to form an opinion, one that you can base and express on a reasonable degree of medical certainty, as to whether or not the overall management of this pregnancy of Drs. Chua and Kleiman did or did not meet appropriate standards of care for a nationally board certified obstetrician in 1994?

He replied: "I think that they did meet the standard, yes." Dr. Hill's responses generally did not reference a specific basis for his opinions when he responded to individual questions, as revealed by the following testimony:

Q. Under appropriate standards of care, ... with what frequency should such ultrasound evaluations [i.e., sonogram evaluations of twin pregnancy] be done?

A. I am not aware of any specific time period. But, generally what is done is every two to three weeks, depending on, again, the severity of any problems that one would be picking up. Two weeks might be an average, to answer directly.

Q. Under appropriate standards of care, was there any requirement to hospitalize [Mrs.] Hawes on December 6?

A. I see none.

Q. Under appropriate standards of care, was a sonogram required to be performed on December 13, a measuring sonogram?

A. I don't—I don't think so.

Q. Why not?

A. Well, one had been performed on the 6th, which was about a week prior. That information was reasonable. I think what was performed there, those two points of information for fetal assessment, was a reasonable choice to make.

Q. Under appropriate standards of care, was there any basis for the obstetrician suspecting twin-to-twin transfusion syndrome at this point in time?

A. I can see none.

Q. Under appropriate standards of care, was there any need for hospitalization of this patient on December 15?

A. I can see no reason.

Q. Based upon your review of the record, is there any indication of twin-to twin transfusion syndrome on December 20?

A. There is none.

However, there apparently was one area on direct examination in which Dr. Hill's responses referenced the basis for his opinions, and that related to fetal heart rate and fetal growth:

Q. What is the basis or why do you say the fetal heart rate is the first to go? . . . .

A. [I]t's stated in textbooks, it's known through research, that fetal reactivity, whether in labor or monitoring a pregnancy, fetal heart reactivity is usually almost always flattened when there is an illness or some kind of compromise to that fetus.

During cross-examination, in response to questions about fetal heart rate and fetal growth, Dr. Hill generally mentioned literature, meetings, national meetings and the American College as a basis for his opin-

ion.[5] He was asked about the frequency with which physicians documented growth. He asserted, in response, that "a two-week interval is the standard that I use and many other physicians do, as well." He was then asked the following questions:

Q. Well doctor, ... you're saying that's the national standard, doctor?

A. It's the standard I've always heard of.

Q. You just heard that around the D.C. area? You've heard that through your colleagues in the local area, right, doctor?

A. Literature, meetings.

Q. In the local area?

A. No. National meetings, American College.

After indicating that he was familiar with the work of Dr. Steven G. Gabbe, OBSTETRICS, NORMAL AND PROBLEM PREGNANCIES, Dr. Hill was asked:

Q. You would agree ... that Dr. Gabbe has identified five sonographic criteria for the almost unequivocal diagnosis of twin-to-twin transfusion syndrome?

A. I've not read that particular passage.[6]

We now turn to the trial court's ruling on the issue of Dr. Hill's testimony. Prior to his cross-examination, counsel for appellants moved to strike Dr. Hill's testimony on the ground that he failed to:

establish[ ] a legally sufficient basis for his opinions in this jurisdiction. He must testify to a national standard of care to a reasonable degree of medical

certainty, and he—moreover, must state the basis for his opinions....

In support of his argument, counsel referenced *Travers v. District of Columbia,* 672 A.2d 566 (D.C.1996). The trial judge disagreed, saying:

This witness has in fact testified to a national standard of care. There's a more recent case.... It's a '99 or late '98 case that says, as long as you say the words, that it's a national standard of care. You don't have to prove how you know it's a national standard of care. We don't have to state that I know it's a national standard of care because I reviewed enough literature or I worked at enough hospitals. As long as you say there's a national standard of care, that's sufficient, and he has done that.

The issue of Dr. Hill's testimony resurfaced several days later when counsel for appellants again took the position that it should be struck. In rejecting counsel's request to strike, the trial judge stated: "I think ... [Dr. Hill's] very first opinion was the management of plaintiff's pregnancy met the national standard of care.... I'm satisfied that he was referencing a national standard of care."

Our review of this court's past cases relating to the sufficiency of proof of the national standard of care reflects some tension that may have prompted the opposite positions taken by the trial court and counsel for appellants on this issue, insofar as it concerns the admissibility of expert testimony. Apparently, this court has not heretofore articulated a standard for determining the admissibility of expert testimony relating to the applicable standard

5. For example, when describing a "modified biophysical profile," which is an "initial [apparently sonogram-type] look at the fetus and its well-being," Dr. Hill pointed out that it was known "in textbooks" and "through research" that a picture of a certain "flattened"

heart rate would reveal a possible compromise to the fetal health.

6. Dr. Hill had provided the passage during his deposition.

of care in a medical malpractice case (as distinguished from the sufficiency of such testimony to withstand a motion for a directed verdict). In *Phillips v. District of Columbia*, 714 A.2d 768 (D.C.1998), a case involving a wrongful death and survival action brought by the estate of a prisoner who committed suicide, the sufficiency of the expert testimony to defeat a defense motion for judgment as a matter of law was at issue. However, there are two sentences which the trial judge may have recalled, out of context when she considered appellants' motion to strike Dr. Hill's testimony: "In the present case, a well-qualified expert used the word 'national' in describing the standard of care. It is reasonable to infer from his testimony that such a standard is 'nationally recognized' by comparable governmental units...." *Id.* at 775. However, the expert in that case specifically mentioned a standard of the American Correctional Association for adult correctional institutions. *Id.* at 775 n. 6. In *Travers, supra*, perhaps the most exacting statement of required standard of care proof in a medical malpractice case, a majority of the panel concluded that the plaintiff's expert failed to articulate a national standard of care for the proper administration of aspirin following the removal of a spleen.[7] We said, in part:

> There must be ... evidence that a particular course of treatment is followed nationally. Reference to a published standard, though not required, can be important in determining whether a national standard's adherence was proven with sufficiency. (citation omitted). Further, if there was evidence that the witness had discussed the described course of treatment with practitioners outside the District, such as at seminars or con-

ventions, and that those other practitioners agreed with the course urged, the testimony might have been sufficiently supported since it would have been based on "adequate data." (citation omitted). Without such proof, there is no indication that the described standard is followed nationally, except the notion that what is done by certain District doctors is nationally followed because the District's doctors are required to adhere to national standards. But that is just another way of saying that the applicable standard is what the testifying expert would have performed, which we have deemed an inadequate showing. (citation omitted).

*Id.* at 568–69. It was significant, we said, that "the expert was unable to specify any published medical standards, manuals, or protocols to support his opinion[,]" and that his "generalizations ... were unsupported by any specific medical literature." *Id.* at 569. Moreover, the expert's background revealed no training or experience outside the District of Columbia, except for six months in Maryland. *Id.* at 569 n. 2.

Two years after *Travers, supra*, we decided *District of Columbia v. Wilson*, 721 A.2d 591 (D.C.1998), a wrongful death case which we described as "conventional medical malpractice litigation," *id.* at 600, and which involved a youthful offender at the Lorton Youth Center. We determined that the testimony of plaintiff's expert as to the national standard of care was sufficient to present that issue to the jury. Plaintiff's expert was "a board-certified pediatrician with extensive experience in the provision of health services at correctional facilities." *Id.* at 593. In stating his opinion, he relied on certain guidelines promul-

---

7. In *Travers,* appellant alleged medical malpractice at the District of Columbia General Hospital where the right half of his right foot was amputated. Although a mistrial was declared, the trial court entered judgment for the defendant on the ground that the plaintiff failed to prove the existence of a national standard of care.

gated by the Public Health Service of the United States Department of Health and Human Services, which were described as a "consensus statement that represents the state of the art at that time." *Id.* at 598 n. 12. In addition, plaintiff's expert also cited "a number of other authorities." *Id.* at 598.

In *Wilson, supra,* we drew a distinction between cases concerning "the protection of an individual from himself, or from the criminal conduct of third parties" and medical malpractice cases. *Id.* at 600. We also focused on two medical malpractice cases pertaining to prisoners and concerning proof of a national standard of care. In *District of Columbia v. Mitchell,* 533 A.2d 629 (D.C.1987), one of the major issues was whether count II of the plaintiff's complaint was based on an ordinary negligence theory, or whether it stated a malpractice claim. The case was submitted to the jury on an ordinary negligence theory, but the trial court granted judgment to the defendant as to the malpractice claim, notwithstanding the jury verdict in favor of the plaintiff. The trial court determined that count II actually stated a malpractice claim, and that plaintiff had not established a deviation from a national standard of care. This court reversed the trial court as to count II, but instead of reinstating the verdict in plaintiff's favor, remanded for a new trial as to count II because the "testimony [of plaintiff's expert] presented a standard of care and a breach of that standard[,] ... [and thus,] was entitled to go to the jury on his malpractice claim." 533 A.2d at 649. In our discussion of *Mitchell* in *Wilson, supra,* which must be read in the context of the count II ordinary negligence/malpractice claim issue before the court, we said:

> There is nothing in the court's opinion to suggest that Dr. Robb identified specific facilities at which a higher level of care was practiced, and there is no indication

that he brought to the attention of the jury any specific standards promulgated by professional associations, or that he quoted from any publications or other medical authorities.

*Wilson, supra,* 721 A.2d at 598.

Our opinion in *Wilson, supra,* also summarized "the substance of the plaintiff's evidence regarding the standard of care," as stated by the plaintiff's expert, in *District of Columbia v. Watkins,* 684 A.2d 395 (D.C.1996), another sufficiency case, as follows:

> I think that the standard of care for a patient with a long history of chronic pain; muscle spasms; unstable back, would be that a physician or physician's assistant, or a nurse, or a medical practitioner of any degree, certainly should have attempted to provide [Watkins] with something to reduce his pain.

*Wilson, supra,* 721 A.2d at 599 (quoting *Watkins, supra,* 684 A.2d at 402). *Watkins* focused on two issues relating to the standard of care: (1) whether the testimony of plaintiff's expert concerned "only ... the standard of care in the Washington metropolitan area" or a national standard of care for health providers; and (2) whether plaintiff's expert merely stated his own personal opinion as to the standard of care. *Id.* at 401–02. To illustrate that the expert's testimony did not constitute his personal opinion, we quoted the excerpt set forth above, and concluded that the expert's testimony "encompassed not just one particular locality, but what was required of a medical facility under the circumstances involved [in that case]"; and thus, his "testimony was sufficient to establish the treatment that a reasonably prudent doctor would have provided under similar circumstances." 684 A.2d at 402 (citing *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984)).

 Our review of *Travers* and *Wilson, supra,* as well as some of our earlier medical malpractice cases, reveals that, in this jurisdiction, at least seven legal principles are important in assessing the sufficiency of national standard of care proof. First, the standard of care focuses on "the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Meek, supra,* 484 A.2d at 581. Second, the course of action or treatment must be followed nationally. *Travers, supra,* 672 A.2d at 568; *see also Morrison v. MacNamara,* 407 A.2d 555, 565 (D.C.1979). Third, the fact that District physicians follow a national standard of care is insufficient in and of itself to establish a national standard of care. *Travers, supra,* 672 A.2d at 569. Fourth, in demonstrating that a particular course of action or treatment is followed nationally, reference to a published standard is not required, but can be important. *Id.* at 568. Fifth, discussion of the course of action or treatment with doctors outside this jurisdiction, at seminars or conventions, who agree with it; or reference to "specific medical literature" may be sufficient. *Id.* at 569. Sixth, an expert's personal opinion does not constitute a statement of the national standard of care; thus a statement only of what the expert "would do under similar circumstances ..." is inadequate. *Meek, supra,* 484 A.2d at 581. Seventh, national standard of care testimony may not be based upon mere speculation or conjecture. *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C.1990).

 The principles set forth above are derived from cases in which the issue generally was whether plaintiff's expert(s) provided evidence sufficient to meet the plaintiff's burden of proof on negligence or causation. The admissibility of a defense expert's opinion obviously differs in that,

as we have seen, such determinations are committed to the broad discretion of the trial judge, *see In re Melton, supra.* We therefore review the admission of a defense expert's medical opinion deferentially, whereas a decision that the expert testimony presented by the plaintiff was (or was not) sufficient to meet her burden of proof is a question ultimately of law that we decide *de novo.* Nevertheless, our decisions make clear that expert testimony, regardless of by whom offered, must meet basic standards of competency and relevancy, and the grounded reference to a national standard is a requisite for any opinion regarding standard of care in a medical malpractice case. Accordingly, a trial judge should be guided by the following factors in assessing the admissibility of national standard of care testimony: (1) it is insufficient for an expert's standard of care testimony to merely recite the words "national standard of care"; (2) such testimony may not be based upon the expert's personal opinion, nor mere speculation or conjecture; and (3) such testimony must reflect some evidence of a national standard, such as attendance at national seminars or meetings or conventions, or reference to published materials, when evaluating a medical course of action or treatment. In concluding that the trial court did not commit manifest error in refusing to exclude defense expert testimony as to the standard of medical care, the Fifth Circuit stated in *Carroll v. Morgan,* 17 F.3d 787 (5th Cir.1994):

> [The defense expert's] testimony was based on thirty years of experience as a practicing, board-certified cardiologist, on his review, among other things, of [the plaintiff's] medical records and the coroner's records, and on a broad spectrum of published materials. His testimony was therefore "grounded in the methods and procedures of science" and

was not mere "unsupported speculation."

*Id.* at 790 (citation omitted).

We turn now to the application of the principles we have distilled from our cases to Dr. Hill's testimony and the trial court's evaluation of that testimony. In applying these principles to Dr. Hill, appellees' national standard of care expert, we are mindful that our opinions concerning a plaintiff's national standard of care expert testimony, by which this panel as well as the trial judges are bound, have ranged from requiring a minimal or modest showing of adherence to a national standard, *see Phillips* and *Wilson, supra,* to a more extensive and substantial showing, *see Travers, supra.*[8] However, we do not understand any of our opinions, read in their totality, to declare that, in a medical malpractice case, a mere recitation of the words "national standard of care" is minimally sufficient to permit the admission of the expert's testimony.

Dr. Hill's testimony contains more than a mere recitation of the words, "national standard of care." Admittedly, in relating his background, Dr. Hill did not specify the types of books or journals with which he was familiar, nor specific national professional meetings which he had attended, that concerned the specialty areas for which he was qualified as an expert in this case. Nevertheless, he stated that he was board certified and licensed in Virginia, Maryland and the District, provided clinical instruction at the Georgetown University Medical School, "ke[pt] up with the state of the medical art [in] obstetrics and gynecology, and was familiar ... with the standards of care that would apply to the ordinary and reasonable OB/GY [obstetrician and gynecologist] in the management of twin pregnancies," including twin-to-twin transfusion syndrome. When counsel for appellants inquired as to the basis for his opinions on cross-examination, with respect to the fetal heart rate, Dr. Hill generally referenced "textbooks" and "research." In discussing fetal growth and whether he had articulated a national standard of care, Dr. Hill initially responded: "It's the standard I've always heard." After being pressed by appellant's counsel, however, he uttered the words "literature, meetings"; and in response to another question added the words "national meetings, American College," which, in context, must be taken as references to national meetings pertaining to obstetrics and gynecology and standards of the American College of Obstetrics and Gynecology.[9] When he was asked about the excerpt from Dr. Gabbe's work, OBSTETRICS, NORMAL AND PROBLEM PREGNANCIES, that he submitted during his earlier deposition, he stated: "I've not read that particular passage." Nonetheless, there is at least some indication in the record that Dr. Hill was familiar with Dr. Gabbe's book.

In light of the principles we distill from our cases concerning national standard of care expert testimony, the trial judge concluded incorrectly, but understandably based upon the range of our opinions, that mere utterance of the words "national

---

8. *Travers, supra,* should be read as a case where the majority held that the expert offered essentially no basis for his statement of the national standard of care. As we stated: "The expert failed to provide any factual basis for his assertion that his testimony reflected a national standard other than his conversations with five or six colleagues within the District." *Id.* at 570.

9. *Compare, e.g., Taylor v. Hill,* 464 A.2d 938, 943 (Me.1983) (referencing the American College of Surgeons, "a national organization which sets standards of care for its member surgeons, ... [and] plays an important role in setting and maintaining national standards of care for surgical specialist.").

standard of care" satisfied our requirements relating to the admission of national standard of care testimony. As she put it: "As long as you say there's a national standard of care, that's sufficient, and he has done that." But, *Travers, Wilson* and *Phillips, supra,* stand for the proposition that something more than mere utterance of the words "national standard of care" is required of experts in medical malpractice cases. As we said in *Travers, supra:* "There must be evidence that a particular course of treatment is followed nationally." *Id.* at 568. In *Phillips, supra,* the expert referenced a standard of the American Correctional Association, and in *Wilson, supra,* a board certified pediatrician relied on consensus guidelines promulgated by the Public Health Service of the United States Department of Health and Human Services.

Here, Dr. Hill's testimony was at least minimally sufficient for admission into evidence since he testified as a board certified obstetrician and gynecologist; kept abreast of "the state of the medical art [in] obstetrics and gynecology," attended national meetings; was familiar with, and based his opinions on, the literature of his specialty, as well as the standards of care, including those of the American College, applicable to a reasonable obstetrician and gynecologist who undertakes the management of twin pregnancies. Moreover, we cannot say that Dr. Hill's opinions were based on nothing more than speculation or conjecture, nor merely constituted his personal opinion. Therefore, we conclude that the trial judge's decision not to strike his testimony did not constitute manifest error. However, we stress that while the trial judge retains considerable discretion in determining whether to admit defense national standard of care expert testimony, (1) it is insufficient for the expert to merely recite the words "national standard of care"; (2) the expert's testimony may not be based on his or her personal opinion, nor on mere speculation or conjecture; and (3) the expert's opinion must reflect some evidence of a national standard, such as attendance at national seminars or meetings or conventions, or reference to published materials, when assessing a medical course of action or treatment.

Appellants other arguments are unpersuasive and may be addressed summarily. First, they contend that a juror should have been removed from the jury panel prior to jury deliberations. Approximately two weeks after the commencement of a lengthy trial, one of the jurors revealed to the court that he recognized a defense expert in radiology, Dr. Michael Friedman, because, some ten years earlier, the juror had worked as a technician (taking x-rays) in the emergency room of Alexandria Hospital where the expert also worked. Although Dr. Friedman's name was mentioned to the jury venire prior to trial, he was not physically present. In addition, even though the juror did not state, during the voir dire, that he had worked at Alexandria Hospital as a technician ten years earlier, he did reveal his training and background in health care. He was a Navy Medical Service Corp. Officer, worked mainly in health care administration, and had "a background [in] operational health care." In deciding not to remove the juror, the trial judge stated:

I think that [the juror] did tell us what his medical background was.

He did not report having worked somehow in an emergency room or some facility or for some entity during which he encountered Dr. Friedman, mentioning Dr. Friedman would not give anybody an opportunity to recall him 10 years later. . . .

As soon as the doctor walked into the [court] room, [the juror] indicated . . .

that he recognized him and he was forthright about it.

I am positive that [the juror] was asked the appropriate questions about whether any of that had any bearing on his ability to be fair and impartial and that if he had any prior conceived conceptions of Doctor Friedman as being an honest or reliable person.... [T]he juror said no.

I do not have anything that would suggest juror bias or intentional failure to disclose information.

We see no abuse of discretion. "A trial judge has broad discretion in deciding whether to exclude a juror for cause." *Johnson v. United States*, 701 A.2d 1085, 1089 (D.C.1997) (citing *Wilburn v. United States*, 340 A.2d 810, 812 (D.C.1975)). We have said that if there is an actual claim of juror bias during trial, the proper procedure for the trial judge is to reopen the *voir dire*. *Id.* Here, the trial judge's procedure of questioning the juror after he revealed his recognition of Dr. Friedman is consistent with our case law. Following questioning, during which counsel were given the opportunity to make inquiries, the trial judge found no actual bias. "This court will not reverse the trial judge's decision not to strike a juror unless the juror's partiality is manifest." *Id.* (citing *Hughes v. United States*, 689 A.2d 1206, 1210 (D.C.1997)). Our review of the record on appeal reveals no manifest juror partiality, and thus, no abuse of discretion.

■ Similarly, we cannot say that the trial judge abused her discretion in failing to strike two other jurors for cause, as appellants argue, based on their "strong feelings about tort suits." The record reveals that the trial judge engaged in rather extensive conversation with the two pro-

spective jurors regarding their views. She concluded that one of the jurors need not be disqualified after saying that: "[I]n general, people are often sued unfairly." The juror also stated that: "[s]ometimes [lawsuits] are just, sometimes they are unjust." Moreover, the trial judge interpreted the juror's responses of—"I think so. Yes, I think so." and "I think so, yeah."— as non-disqualifying based, in part, on his belief that there are both just and unjust lawsuits, and on his past tort reform work for a product liability law firm during which "[h]e didn't try and prevent people from being able to address their grievances before the Court." After questioning this juror in some detail, the trial judge stated, in part: "I wasn't at all persuaded that he couldn't be fair." The trial court questioned the other juror even more extensively, and satisfied herself that he would be impartial. Indeed, the juror himself stated: "I am neutral. I am neutral." Furthermore, neither of these jurors actually served on the jury in this case.[10]

■ Second, appellants maintain that the testimony of defendant, Dr. Chua, should have been stricken because she violated the rule on witnesses by talking with her co-defendant Dr. Kleiman during a break between Dr. Chua's direct and cross-examination testimony. We have stated previously that less severe remedies may be imposed for a violation of the rule on witnesses than the striking of the witness' testimony. *See Bourn v. United States*, 567 A.2d 1312, 1317 (D.C.1989). These include "commenting to the jury on the witness' conduct, ... and allowing opposing counsel to cross-examine the witness on the nature of the violation...."

10. Appellants' argument that they could have used their peremptory challenges to strike others is unavailing. *See United States v. Abel*

*Martinez–Salazar*, 528 U.S. 304, 314–16, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); *Doret v. United States*, 765 A.2d 47, 53 (D.C.2000).

*Id.* Here, the trial judge not only informed the jury of the rule on witnesses, but also instructed them that, if they found a violation of the rule, they could consider it in evaluating Dr. Chua's testimony. Moreover, the trial court allowed extensive cross-examination into the nature of the conversation between Dr. Chua and Dr. Kleiman. As we said in *Bourn, supra:* "The trial court has broad discretion in determining the appropriate remedy for alleged violations and we find no abuse of discretion." *Id.* (citing *Nowlin v. United States,* 382 A.2d 9, 12 (D.C.1978)) (other citation omitted).

Third, appellants assert that the trial court erred by not allowing them to impeach Dr. Hill as to his alleged financial bias in the case. Their theory of bias was based on the fact that Dr. Hill, Dr. Chua and Dr. Kleiman all were insured by the same carrier. Appellants' counsel wanted to ask "whether or not a verdict in favor of the plaintiffs would have an adverse financial impact on [Dr. Hill]." The trial court disallowed the inquiry, saying in part: "[T]he prejudicial impact of discussion of insurance in any civil case is so high that, unless really necessary, it's going to outweigh the probative value." Appellants' counsel proffered no specific facts showing that because Dr. Hill had the same insurance carrier as Doctors Chua and Kleiman, that he would suffer adverse financial consequences if the jury rendered a verdict against them. Nonetheless, appellants ask us to rely on *Davis v. Immediate Med. Servs., Inc.,* 80 Ohio St.3d 10, 684 N.E.2d 292 (1997), and to hold that a trial judge must allow cross-examination as to commonality of insurance coverage between a defense expert witness and a defendant in a medical malpractice case. We decline to do so in this case.

Ohio apparently is the only jurisdiction to adopt a *per se* rule concerning commonality of insurance evidence. *See Bonser v. Shainholtz,* 3 P.3d 422, 425 n. 2 (Colo. 2000). In contrast to Ohio, the majority of jurisdictions follow the "substantial connection" analysis:

> The substantial connection analysis looks to whether a witness has "a sufficient degree of 'connection' with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness." *Otwell v. Bryant,* 497 So.2d 111, 115 (Ala.1986). These courts have rejected a mere "commonality of insurance" approach, holding that the likelihood of bias is so attenuated that the risk of prejudice substantially outweighs the probative value. For example, the Alabama Supreme Court refused to allow evidence that an expert witness was insured by the same insurance carrier as the defendant when this was the only connection between the witness and the insurance carrier. *See id.* at 113–114. However, in another case that court allowed evidence that an expert witness was a member of the board of directors and was employed by the same liability insurer as the defendant. *See Hinton & Sons v. Strahan,* 266 Ala. 307, 96 So.2d 426, 431–32 (1957).

*Id.* at 425. *Bonser* also references and discusses other cases that apply the "substantial connection" analysis. *See id.* at 425–26. In the case before us, given the trial court's broad discretion in admitting evidence, *see Knight v. Georgetown Univ.,* 725 A.2d 472, 477 (D.C.1999), the absence of a proffer showing a "substantial connection" between the insurance carrier and Dr. Hill, such as his involvement as an agent of the insurance company, *see Adkins v. Morton,* 494 A.2d 652, 662 (D.C. 1985), and our recognition that reference to insurance during a civil trial may be prejudicial, *Parks v. Ratcliff,* 240 A.2d 659,

660 (D.C.1968), we cannot conclude that the trial court abused its discretion by disallowing cross-examination regarding the commonality of insurance carrier between the defense expert and one of the defendant doctors.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.