Cheri SNYDER, Appellant,[1]

v.

GEORGE WASHINGTON
UNIVERSITY,
Appellee.

No. 02–CV–1395.

District of Columbia Court of Appeals.

Argued June 15, 2004.

Decided Jan. 12, 2006.

1. This case was originally captioned as Leroy Saunders v. George Washington University. Appellant filed a Notice of Death and Motion to Substitute a Party on March 18, 2005. The motion was granted on March 28, 2005.

Joseph Ryland Winston, Richmond, VA, with whom Donald L. McClure, Sr., and

Julia Williams, Washington, DC, were on the brief, for appellant.

Larry D. McAfee, Chantilly, VA, with whom James P. Gleason, Jr., Rockville, MD, was on the brief, for appellee.

Before WASHINGTON, Chief Judge,[2] RUIZ and GLICKMAN, Associate Judges.

WASHINGTON, Chief Judge:

Appellant Leroy Saunders ("Saunders") appeals the trial court's entry of a directed verdict in his medical malpractice case against George Washington University ("GWU") on the grounds that he failed to establish his *prima facie* case. Saunders contends that the testimony of his expert witness, Dr. Oswald Hoffler ("Dr. Hoffler"), was sufficient to establish that GWU's breach of a national standard of care proximately caused his injuries. In addition, Saunders argues that the trial court abused its discretion in failing to admit the deposition of another expert witness, Dr. William J. Brownlee ("Dr. Brownlee"), whose testimony, he claims, was sufficient to prove both causation and the national standard of care. Because Dr. Hoffler's testimony established the national standard of care and a breach of that standard, and because Dr. Brownlee's improperly-excluded testimony adequately established causation, we conclude that Saunders established a *prima facie* case of negligence, and, thus, the trial court erred in directing a verdict against him. Consequently, we reverse and remand for a new trial.

## I.

Saunders filed a complaint for medical malpractice against GWU on September 7, 1999. The complaint alleged that the hospital, through its interventional radiologists and other medical employees, negligently treated Saunders before, during, and after an angioplasty procedure. Specifically, the complaint charged GWU with: (1) negligence in failing to timely diagnose and treat the retroperitoneal bleed which caused his paralysis; (2) failing to obtain informed consent to perform the angioplasty; and (3) failing, after the angioplasty, to consult with a vascular surgeon where evidence suggested that a bleeding complication was likely to occur.

### A. Dr. Brownlee's Deposition Testimony

In the course of the discovery process, GWU deposed Saunders' expert witness, Dr. Brownlee, for the purpose of discerning the nature and substance of his anticipated trial testimony. During his testimony, Dr. Brownlee was questioned on and addressed GWU's alleged breach of a national standard of care on several different occasions:

Q: Is that a breach of the standard of care, that the stick caused this bleed in the retroperitoneal area, or is that a natural complication of placing a femoral stick?

A: That's a natural complication of placing the stick. The breach of the standard of care is not in the stick, itself, and not in the formation of bleeding from the stick. The breach is from the lack of recognition of the complication occurring with the manifestation of symptoms. (R. 386–87).

. . .

A: [Saunders] got what we call in general surgery a silent bleed. The reason I can tell you we are familiar with this is because in hernia surgery we know that we can sometimes stick the femoral ves-

**2.** Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

sel. We know if we stick the femoral vessels you can get a retroperitoneal bleed from it.

Q: Is that a breach of the standard of care?

A: To stick them?

Q: When you stick them?

A: No. To not recognize that you've got a bleeding patient is a breach of the standard of care. The Heparin only augments the fact of the hematoma formation. The breach comes in that he has complaints that should be evaluated, the fact that he is showing that he's bleeding and he's not being properly evaluated.

Q: Do you have a criticism of the fact that the patient was on Heparin to begin with at this point in time?

A: No. The criticism [is] that you do not recognize he's bleeding and you continue him on Heparin. That's kind of a subset. It's a breach in terms of maintaining him on Heparin on a bleeding patient.

. . .

Q: When should a CAT scan have been done on the 28th or the 29th?

A: The 28th ideally, the 29th absolutely. I'm saying the 29th absolutely because what you are doing, you're transfusing a man between the 28th and the 29th, and you're only bringing him up from 6.8 to 7.9, and if I am not mistaken he's gotten two units of blood. (R. at 393).

. . .

Q: So it's fair to say, at least my understanding of your opinion is that silent bleeds or spontaneous bleeds are known complications of femoral sticks?

A: Correct.

Q: And the fact that that occurred isn't a breach of the standard of care. The breach of the standard of care is the fact that they didn't, for lack of a better term, catch it and investigate it quick enough?

A: Correct. Failure to recognize. (R. at 400–01).

. . .

Q: So is it your opinion, I believe you've already given this testimony on September 27th, 1996, with a PTT reading of over 100 seconds the Heparin should have been discontinued at that point, 9/27/96?

A: Yes, that hour. This is in the evening hour, this is some six or eight hours or maybe longer after the procedure, the invasive procedure is done. (R. at 428).

Dr. Brownlee also rendered his opinion at least four times on the issue of causation:

Q: What effect would doing a CAT scan on the 28th, and if not the 28th the 29th, what effect would that have had on the outcome here?

A: To a reasonable degree of medical probability, it would have prevented the compression of the lumbricals and the causation of his cord infarct. (R. at 394).

. . .

Q: If the CAT scan had been done on the 29th and the CAT scan showed the bleed/hematoma, would the outcome have been averted, the outcome being paralysis from the legs down?

A: To a degree of medical probability, it would have been averted or at least to a lesser extent in terms of the loss. The loss would have been less. (R. at 397).

. . .

Q: Okay. So, once again, would some action at that point to evacuate the

hematoma or give him additional blood, would that be meaningful at that point?

A: Giving him additional blood would not help him, but evacuating the hematoma may help curtail the advancement of the process. (R. at 433).

At another point, in regard to causation, Dr. Brownlee stated that had Saunders been drained on an earlier date, his paralysis would have been less severe. (R. at 409).

During the deposition, GWU did not raise any objections to the doctor's qualifications to render expert opinions on causation or the applicable standard of care. Although Saunders had planned to call Dr. Brownlee as an expert during the trial, Dr. Brownlee died before he could testify for Saunders in court. Because Dr. Brownlee was no longer available to testify, Saunders sought to introduce Dr. Brownlee's deposition testimony under Super Ct. Civ. R. 32(a)(3)(A), which permits the deposition of a witness to be used at trial in the event of that witness' untimely death. In a joint pretrial statement filed on April 22, 2002, Saunders gave notice of his intention to offer Dr. Brownlee's deposition into evidence at trial.

At trial, however, GWU objected to the admission of Dr. Brownlee's deposition on the ground that the doctor was not "qualified as an expert familiar with the standard of care" in accordance with this court's ruling in *Hawes v. Chua*, 769 A.2d 797 (D.C.2001).[3] After reviewing the contents of the deposition during a brief recess, the trial court agreed that Saunders had failed to lay an adequate foundation during the course of the deposition to establish that Dr. Brownlee possessed the expertise necessary to testify about the national standard of care. Although GWU never specifically objected to the admissibility of Dr. Brownlee's causation testimony, the court ruled that Saunders had failed to lay a sufficient foundation for the admission of that testimony as well. Concluding that "we're in the same situation with respect to either the standard of care or causation," the trial court ruled that Dr. Brownlee's deposition was inadmissible.

### B. Dr. Hoffler's Trial Testimony

Once the trial court excluded Dr. Brownlee's deposition, Dr. Hoffler became Saunders' sole expert designated to testify regarding the national standard of care and the cause of his paralysis. Following voir dire, GWU moved to exclude Dr. Hoffler on the ground that, like Dr. Brownlee, Dr. Hoffler had not demonstrated familiarity with the national standard of care.[4]

---

3. Before expert testimony about the standard of care may be admitted, it "must meet basic standards of competency and relevancy, and the grounded reference to a *national* standard is a requisite for any opinion regarding standard of care in a medical malpractice case." *Hawes*, 769 A.2d at 806 (emphasis added). In *Hawes*, we set forth a number of factors relevant to the admissibility of standard of care testimony:

> (1) it is insufficient for an expert's standard of care testimony to merely recite the words 'national standard of care'; (2) such testimony may not be based upon the expert's personal opinion, nor mere speculation or conjecture; and (3) such testimony

must reflect some evidence of a national standard, such as attendance at national seminars or meetings or conventions, or reference to published materials, when evaluating a medical course of action or treatment.

*Id.* It was GWU's position that the testimony in Dr. Brownlee's deposition failed to meet this standard.

4. GWU did not actively challenge Dr. Hoffler's ability to testify with respect to causation, explaining, "I would defer to the Court's interpretation of his testimony on that ... I submit I don't think the question on the specialized training is nearly as close."

Although the trial court expressed concern about Dr. Hoffler's competence to testify regarding either the national standard of care or causation, the court nevertheless allowed him to testify. The court reserved the right, however, to strike Dr. Hoffler's testimony in the event that it exceeded the bounds of his qualifications.

During direct examination, Dr. Hoffler testified as to the standard of care and the breach of that standard at least three times:

Q: Okay. What, if anything, should [the physician] have done in your opinion?

A: Well, he should have called somebody for help because this patient was bleeding. People do not bleed after getting femoral sticks, as you called them. They don't bleed. They bleed if you have them full of anti-coagulants, so they won't stop. But bleeding is non-happening.

Q: What else should have been done in this situation, if anything?

A: Well, they—do you wish me to think about the other—speak of the writing on the page?

Q: Whatever there you think is significant that you rely on?

A: It's a sign of danger. It's a sign of a complication. A patient has a procedure done that normally doesn't upset the patient's condition. You do these and people do not have pain and weakness at all. You have to have them lie down for an hour. Put pressure over the area where you stuck the needle and usually they can get up and go home afterwards.

Q: Okay. What should have been done at this point in time, is my question?

A: Well, at this point in time, they should have been wondering why is he bleeding and let's see if we can't find out where the blood is coming from. (9/11/02 Tr. at 128–29).

. . .

Q: Okay. So in your opinion, what should have been?

A: Plus the fact his blood pressure was gone.

Q: Okay.

A: So he should have been immediately investigated. They already were doing blood count. They probably should have done a CT scan on the patient.

. . .

Q: Doctor Hoffler, my question to you, first of all, is what was the applicable standard of care following the interventional procedures on September the 27th, 1996? Do you understand that question?

A: I do.

Q: Okay.

A: The applicable standard of care was, number one, to follow the patient very carefully because he had had an intervention performed. The next standard that should have been met is that they should have been able to establish some reason, actually get a conclusion as to what the intervention showed.

Thirdly, there is an obligation of the hospital and its staff to follow the patient regularly and several times a day because he was complaining. The next deviation is that though he was paining, they should have made an attempt to find out why he was hurting because this is not usual with this procedure. The next reason is that a long delay in getting the correct diagnostic procedures done, and I'm referring to the CT scan, the study, also a study that would assist the hospital people in finding out where the bleed-

ing was occurring, neither of these were done. They did have an obligation to pay more attention and that's the standard of care to the patient's complaints, physical complaints of discomfort. All of these should have been rendered in a much more timely manner than they were.

Q: Now, what is your opinion within a reasonable degree of medical certainty as to what the deviations from the standard of care were after September the 27th, 1996?

THE COURT: I thought he just told us that. I thought he just answered the question.

MR. McCLURE: Okay. I thought he just told me what the standards were.

THE COURT: Well, I think you've blended it all together. He did answer the question. (9/12/02 Tr. at 22–24).

## C. Trial Court's Decision

At the close of Saunders' case-in-chief, GWU argued that it was entitled to judgment as a matter of law. Having heard Dr. Hoffler's opinions with respect to both standard of care and causation, the trial court focused on its conclusion that the doctor had failed to establish the "mechanism of causation":

THE COURT: I mean I'm giving, for purposes of this discussion, you the benefit of the doubt as to the breach of the standard of care. Okay? You still have the most critical piece of evidence that you've got to establish in this case, and that is that there's a relationship between this breach of the standard of care and the actual, the actual injury that Mr. Saunders suffered, the spinal infarct.

MR. McCLURE: Okay.

THE COURT: And that is where the record is void of any evidence from Dr. Hoffler or anyone else as to what

the relationship would be, if it even existed. That's my problem. And I think that's the reason that the defense is making the strong argument that it is making.

. . .

THE COURT: I am going to have to rule in the defense favor. I do not see how I can allow the case to go to the jury, where there is no evidence from any competent witness as to the causation. . . . Because [Dr. Hoffler's] testimony basically demonstrated that he didn't know what the mechanism of causation was here. And I have some serious questions as to whether he even laid out, number one, the standard of care and the treatment in this case, and the breach of that standard of care. But the most critical failure, it seems to me, of proof is with respect to the causation. (9/16/02 Tr. at 39–41).

As a result, the trial court granted GWU's motion for judgment as a matter of law because Saunders had failed to make his *prima facie* case of negligence. This timely appeal followed.

## II.

▮▮▮▮ In the instant case, we are called upon to determine whether the trial court erred in granting GWU's motion for judgment as a matter of law and directing a verdict against Saunders. " '[W]e review the grant of a [judgment as a matter of law] *de novo*, applying the same standards as the trial court.' " *Brown v. Nat'l Acad. of Sciences*, 844 A.2d 1113, 1117–18 (D.C. 2004) (quoting *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 946 (D.C. 2003)) (alteration in original). A directed verdict is appropriate "only if, when the evidence is viewed in the light most favorable to the opposing party, there is 'no

legally sufficient evidentiary basis for a reasonable jury to find' for the nonmoving party." *Brown,* 844 A.2d at 1117–18 (citing Super. Ct. Civ. R. 50(a)). "Thus, '[a] verdict may be directed only if it is clear that the plaintiff has not established a prima facie case.'" *Haynesworth v. D.H. Stevens Co.,* 645 A.2d 1095, 1097 (D.C. 1994) (quoting *Clement v. Peoples Drug Store, Inc.,* 634 A.2d 425, 427 (D.C.1993)).

 In a medical malpractice case, the plaintiff must establish the "applicable standard of care, [a] deviation from that standard and a causal relationship between the deviation and the injury." *Travers v. District of Columbia,* 672 A.2d 566, 568 (D.C.1996) (citing generally *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181 (D.C.1990)). Expert testimony is typically required to establish each of the three elements "'except where proof is so obvious as to lie within the ken of the average lay juror.'" *Derzavis v. Bepko,* 766 A.2d 514, 519 (D.C.2000) (quoting *Washington Hosp. Ctr.,* 579 A.2d at 181). One of Saunders' claims—and the primary theory advanced on appeal—is that GWU failed to timely diagnose and treat his internal bleeding, resulting in a hematoma (or pooling of blood) around his spinal cord that damaged his spinal tissue, causing his paralysis and subsequent loss of limbs. "Because the present case 'involve[d] ... the exercise of professional skill and judgment,' expert testimony was required to make a *prima facie* showing of negligence." *Derzavis,* 766 A.2d at 520 (quoting *Harris v. Cafritz Mem'l Hosp.,* 364 A.2d 135, 137 (D.C.1976)).

As expert testimony was required for Saunders to survive a directed verdict in this case, Saunders' appeal necessarily focuses upon the trial court's rulings with respect to the admissibility and sufficiency of the evidence presented by his two experts, Dr. Hoffler and Dr. Brownlee.

First, Saunders argues that, viewing the evidence in the light most favorable to him, a juror could reasonably infer from Dr. Hoffler's testimony that GWU breached a national standard of care by failing to diagnose and treat his bleeding complication, which proximately caused his paralysis. Second, Saunders argues that the trial court erred in failing to admit Dr. Brownlee's deposition testimony regarding both the national standard of care and causation because, *inter alia,* GWU waived all objections to Dr. Brownlee's qualifications by failing to raise those objections either at the time the deposition was taken or in the joint pretrial statement.

For the reasons outlined below, we conclude that the trial court erred in excluding Dr. Brownlee's deposition. Taking into account the testimony of Dr. Hoffler and the deposition of Dr. Brownlee, we conclude that there was adequate combined evidence to prove that GWU breached the national standard of care, and that breach caused Saunders' injuries.

### A. Dr. Hoffler's Testimony

 The trial court, with some reservation, initially found that Dr. Hoffler was qualified to testify as an expert regarding the national standard of care. In directing a verdict in this case, the trial court suggested, but did not rule, that Dr. Hoffler's testimony may have been insufficient to establish a national standard of care. On appeal, GWU argues that Dr. Hoffler's standard of care testimony was insufficient as a matter of law to survive a directed verdict. In support of this argument, GWU points to the trial court's statement that Dr. Hoffler did not appear to have set forth the "standard of care for performing the angioplasty to the femoral artery ... [a]nd even if there were a perforation, whether that is a breach."

Initially, we point out that in conducting our *de novo* review of Saunders' *prima facie* case, we are not bound to follow the trial court's rulings on the sufficiency of the evidence to withstand a directed verdict. *See Hawes,* 769 A.2d at 806. Furthermore, even assuming the trial court was correct that Saunders failed to establish the national standard of care for performing an angioplasty procedure, this would not defeat his *prima facie* case. In addition to his claim that GWU was negligent in its performance of the angioplasty, Saunders' contention has always been that GWU failed to diagnose and treat a bleeding complication that arose while he was under the hospital's care. Evidence establishing that the hospital was negligent in *causing* the bleeding complication is not necessary to prove Saunders' theory that the hospital had a duty to find and stop the bleeding once it started. Therefore, Saunders' complaint cannot fail simply because he did not provide testimony to support an additional, albeit somewhat-related, theory of negligence.

Based on our independent review of the record, we find that Dr. Hoffler's testimony establishing a national standard of care with respect to the diagnosis and treatment of bleeding complications was legally sufficient. When asked to identify the applicable standard of care that the hospital should have followed after performing the invasive angioplasty procedure, Dr. Hoffler gave the following testimony:

The applicable standard of care was, number one, to follow the patient very carefully because he had had an intervention performed. The next standard that should have been met is that they should have been able to establish some reason, actually get a conclusion as to what the intervention showed. Thirdly, there is an obligation of the hospital and its staff to follow the patient regularly and several times a day because he was complaining. The next deviation is that though he was paining, they should have made an attempt to find out why he was hurting because this is not usual with this procedure. The next reason is that a long delay in getting the correct diagnostic procedures done, and I'm referring to the CT scan, the study, also a study that would assist the hospital people in finding out where the bleeding was occurring, neither of these were done. They did have an obligation to pay more attention and that's the standard of care to the patient's complaints, physical complaints of discomfort. All of these should have been rendered in a much more timely manner than they were.

Although Dr. Hoffler's testimony is not by any means a model of clarity, viewing it as we must, in the light most favorable to Saunders, Dr. Hoffler established that the hospital had a duty to follow Saunders more closely than it did after his renal angioplasty because he was complaining of pain, and to perform diagnostic tests such as a CT scan as soon as it became apparent that he was losing blood. The hospital breached this standard of care, according to Dr. Hoffler, by not exploring why Saunders was bleeding, as this was abnormal in his situation. Dr. Hoffler also testified that the physicians failed to perform exploratory tests, such as a CT scan, on Saunders in a timely manner.

The fact that Dr. Hoffler did not expressly use the words "national standard" when stating his expert opinion does not, in itself, render his opinion inadmissible. *See generally District of Columbia v. Watkins,* 684 A.2d 395 (D.C.1996). Our primary concern is whether "[i]t is reasonable to infer from [the] testimony that such a standard is nationally recognized." *Phillips v. District of Columbia,* 714 A.2d 768,

775 (D.C.1998) (internal quotation marks omitted). During voir dire, Dr. Hoffler indicated that any subsequent testimony regarding the standard of care for the management and treatment of possible bleeding complications would reflect a national standard. Dr. Hoffler explained that during his forty years of practice as a board-certified general surgeon and a fellow of the American College of Surgeons,[5] he had encountered patients who experienced internal bleeding from stab wounds or other accidents which required him to diagnose and treat the bleeding. He testified that his knowledge of the national standard of care was "[b]ased on [his] personal experience, [his] education, the frequent meetings [ ], the College of Surgeons meetings, things that [they] have to do when [they] become certified by the Joint Commission." Although he had not, himself, ever encountered a patient suffering from internal bleeding caused by a stick in the femoral artery, he testified that "the literature is full of it" and that he made "every effort" to keep up to date on the literature with regard to the national standard on treating and managing these bleeding complications. Dr. Hoffler further testified that he was familiar with the national standard required after a patient has undergone an interventional procedure, such as that involved in this case.

He explained that the basis for his knowledge in this area was his "[e]ducation, experience, continued discussions about these matters in hospital staff meetings, surgical society meetings, in the medical journals . . . ." With respect to his familiarity with the national standards of care pertaining to the requirement to investigate and evaluate the complaints of patients, Dr. Hoffler again reiterated that his knowledge was based on "education . . . experience . . . training, what other people who are knowledgeable about such things say and write." The foregoing statements indicate that Dr. Hoffler's expert opinion reflected evidence of a national standard and was "not . . . based upon [his own] personal opinion, nor mere speculation or conjecture." *Hawes*, 769 A.2d at 806. Therefore, we conclude that Dr. Hoffler's expert opinion was sufficient to establish evidence both of the national standard of care and a breach of that standard in Saunders' case.[6]

### B. Dr. Brownlee's Deposition

■■ In addition to establishing a national standard of care, Saunders was required to prove that GWU's breach of that standard *caused* his subsequent injuries. To establish causation, a plaintiff must "present evidence from which a reasonable

---

**5.** "The American College of Surgeons is a scientific and educational association of surgeons that was founded in 1913 to improve the quality of care for the surgical patient by setting high standards for surgical education and practice." *See* American College of Surgeons website *at http://www.facs.org/about/corppro.html* (last visited Aug. 8, 2005).

**6.** To the extent that GWU's brief suggests that Dr. Hoffler was unqualified to testify to the national standard of care because he was neither an interventional radiologist nor personally experienced in "diagnosing, managing, or treating bleeding complications resulting from the perforation of the femoral artery or from other complications of interventional

radiological procedures," this court has firmly rejected the position that an expert must be a member of the same specialty as defendant doctors in order to testify as an expert. *See, e.g., Battle v. Thornton*, 646 A.2d 315, 322 n. 8 (D.C.1994); *In re Melton*, 597 A.2d 892, 897–98 (D.C.1991) (en banc); *District of Columbia v. Anderson*, 597 A.2d 1295, 1299 (D.C.1991); *Ornoff v. Kuhn and Kogan Chartered*, 549 A.2d 728, 732 (D.C.1988). Because we accept Dr. Hoffler's testimony that he was familiar with the standard of care related to the medical procedures involved in this case, he could qualify as an expert. *See Battle*, 646 A.2d at 322 n. 8.

juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable." *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986). The causal relationship between breach and injury is established through expert testimony, " 'based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries.' " *Derzavis,* 766 A.2d at 522 (quoting *Allen,* 509 A.2d at 624). On appeal, Saunders contends that Dr. Brownlee's testimony regarding causation was erroneously excluded and that, had it been presented, it would have established the causal element of his *prima facie* case.[7] We address the sufficiency of that evidence to withstand a directed verdict.

### 1. Sufficiency of Dr. Brownlee's Causation Testimony

Although GWU raised an objection, citing *Hawes v. Chua,* to Dr. Brownlee rendering an opinion on the standard of care, GWU did not specifically challenge the doctor's testimony with respect to causation.[8] Despite this, the trial court excluded Dr. Brownlee's causation testimony for the "same reason" it excluded his testimony regarding the standard of care—because he failed to lay an adequate "foundation" for the admission of that testimony. We agree with the trial court that there was no sufficient foundation laid nor suffi-

cient evidence adduced that Dr. Brownlee was qualified to render an opinion as to the national standard of care. Based on a review of the record, however, we find that the trial court erred in excluding Dr. Brownlee's causation testimony because there was an adequate foundation laid and because his testimony on causation was detailed and based on his review of Saunders' medical records.

It is not altogether clear what the trial court meant when it said there was no "foundation" for Dr. Brownlee to testify about causation. In ruling that it was excluding Dr. Brownlee's causation testimony "for the same reason" as it excluded his standard of care testimony, the court appears to have mistakenly applied the rule set forth in *Hawes v. Chua,* 769 A.2d at 797, governing the admissibility of standard of care testimony. Although that case supports the proposition that Dr. Brownlee's general training and experience, alone, did not qualify him to testify about national standards of care, it does not follow that Dr. Brownlee's experience as a general surgeon would not qualify him to offer *causation* testimony. Dr. Brownlee testified that he had performed 100–120 surgical procedures per year, and that in the past ten years, he estimated having performed in excess of 1200 to 1500 cases. As we have often said, the "training and specialization of the witness go[es] to the weight rather than admissibility of the evidence, generally speaking." *Battle,* 646 A.2d at 322 n. 8 (quoting *Baerman v. Reisinger,* 124 U.S.App. D.C. 180, 181, 363

---

7. Saunders also argues that Dr. Hoffler's testimony adequately showed that GWU's failure to diagnose and treat his internal bleeding proximately caused his paralysis and the subsequent loss of his right leg. We need not decide whether Dr. Hoffler's causation testimony was sufficient to withstand a directed verdict, however, because we conclude that the trial court erred in excluding Dr. Brown-

lee's causation testimony which would have established causation.

8. As we have just discussed, GWU had an obligation to object either at the deposition or before the court if it believed that, as a general surgeon, Dr. Brownlee was not qualified to give such causation testimony. GWU, however, failed to raise any objection.

F.2d 309, 310 (1966)). In any event, using the term "foundation" in its traditional sense, the court manifestly erred in concluding that Dr. Brownlee lacked a foundation for his opinion. Typically, courts "have required the party presenting opinion evidence to lay a foundation for it—that is, to make clear the *facts* upon which an opinion was based . . . ." *Clifford v. United States*, 532 A.2d 628, 632–33 (D.C. 1987) (emphasis added). In this case, Dr. Brownlee testified that his opinion was based upon the facts contained in appellant Saunders' medical records. Therefore, counsel did lay an adequate foundation for the admission of Dr. Brownlee's opinion. *See id.*

GWU contends that Dr. Brownlee's causation testimony was inadmissible because he failed to adequately explain the "mechanism of injury" that caused Saunders' paralysis. Specifically, GWU claims that Dr. Brownlee needed to explain, to a reasonable degree of medical certainty, the mechanics of "how cord compression can cause cord infarction" and "[how] spinal cord infarction causes the nerves around the affected area of the spine to die." In the absence of such testimony, GWU claims that "a jury would be left to infer or speculate regarding this vital element of his case." *See Travers*, 672 A.2d at 568 (quoting *Washington Hosp. Ctr.*, 579 A.2d at 181, as stating that "[t]he purpose of expert testimony is to avoid jury findings based on mere conjecture or speculation."). Although testimony about the causal mechanics of an injury may ultimately have been useful to a juror charged with deciding between two complex, competing theories of causation—as would have been the case if GWU had put on its own expert and Saunders' claim had been sent to the jury—this court has never required a plaintiff to present such detailed causation testimony in order to withstand a directed verdict. We require only that a causation expert state an opinion, based on a reasonable degree of medical certainty, that the defendant's conduct was a likely cause of the plaintiff's injuries. *See Allen*, 509 A.2d at 624. In *Robinson v. Group Health Ass'n*, 691 A.2d 1147 (D.C.1997), we found an expert's causation testimony sufficient to go to the jury where he "testified to 'a reasonable degree of medical certainty,' . . . that if there had been an early vascular consult, followed by an angioplasty and perhaps a partial foot amputation, a below-the-knee amputation could have been avoided." *Id.* at 1150. Similarly, in *Allen*, where the plaintiff charged the defendant hospital with negligence in failing to prevent the suicide of one of its patients, we refused to set aside the verdict where the psychiatric expert testified "based on a reasonable degree of medical certainty, that the acts and omissions of the Institute caused or contributed to Daniel's death." *Allen*, 509 A.2d at 623.

When measured against the testimony presented in cases such as *Robinson* and *Allen*, it becomes clear that Dr. Brownlee's testimony was sufficient to withstand a directed verdict. Dr. Brownlee testified "[t]o a reasonable degree of medical probability," that "the hematoma developed as a result of the stick of the right femoral artery . . . ." Dr. Brownlee also testified that if the hospital had performed a CAT scan on either the 28th or 29th of September 1996, discovered the hematoma, then drained it, "[t]o a reasonable degree of medical probability, it would have prevented the compression of the lumbricals[9] and the causation of his [spinal] cord infarct."

9. Dr. Brownlee explained that the lumbricals "are the vessels leading from the aorta that supply the [spinal] cord."

Based on this testimony, a jury could reasonably conclude that GWU's failure to diagnose and treat Saunders' hematoma was "more likely than anything else to have been the cause" of Saunders' paralysis. *Derzavis,* 766 A.2d at 522 (quoting *Allen,* 509 A.2d at 624).

█ Based on a review of all the testimony, therefore, we conclude that, when taken together, the testimony of Dr. Hoffler and Dr. Brownlee was sufficient to establish Saunders' *prima facie* case of negligence. Dr. Hoffler's testimony established both the standard of care and a breach of that standard, and Dr. Brownlee's testimony adequately established causation and was consistent with the notion that there was a breach. Therefore, because Saunders presented sufficient evidence to survive GWU's motion for judgment as a matter of law, the trial court erred in directing a verdict against Saunders.

For the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.

*So ordered.*