Ngozika J. NWANERI, Appellant

v.

Carrington B. SANDIDGE, Appellee.

No. 05–CV–1202.

District of Columbia Court of Appeals.

Argued May 30, 2007.

Decided Sept. 6, 2007.

Alfred F. Belcuore, Washington, DC, for appellant.

Vincent Nappo, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and SCHWELB, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Appellant, Dr. Ngozika J. Nwaneri, seeks reversal of the trial court's denial of a Motion for Judgment as a Matter of Law, or in the alternative, for a new trial. Appellant contends that Dr. Steven P. Woratyla, appellee's expert, failed to provide a sufficient foundational basis for his knowledge of the national standard of care in performing below-the-knee surgery on claudicant patients,[1] or to provide a basis for his expert opinion that appellant deviated from the national standard of care. Contrary to appellee's assertions, Dr. Woratyla's expertise in the field of vascular surgery, standing alone, without specific testimony or evidence in the record establishing the basis for his knowledge of the national standard of care for claudicant patients, was insufficient to lay the proper evidentiary foundation to allow Dr. Woratyla to give expert opinion testimony that appellant deviated from the standard of care.

While we recognize that this is a close case, we are constrained to hold that the trial court erred in denying appellant's Motion for Judgment as a Matter of Law. Appellee failed to establish that his expert witness had knowledge of, or that his testimony was grounded in, a national standard of care regarding treatment of claudicant patients—a prerequisite for medical malpractice actions brought in this jurisdiction. However, because we find that appellee's trial counsel may have reasonably concluded that he did not need to go further in providing a sufficient basis for his opinion when the trial court overruled appellant's foundational objections, we remand to the trial court for a new trial.

## I. Factual and Procedural Background

Mr. Sandidge, filed a medical malpractice and informed consent claim against appellant, Dr. Nwaneri, in the District of Columbia Superior Court on May 4, 2001. Mr. Sandidge alleged in his Complaint that Dr. Nwaneri breached the applicable standard of care in performing the surgery, causing Mr. Sandidge to suffer injuries and require additional surgeries on his right knee. He also alleged that Dr. Nwaneri failed to obtain his informed consent in performing composite graft knee surgery.

A jury trial commenced and Mr. Sandidge's sole expert witness, Dr. Woratyla, purported to testify as to the national standard of care applicable to composite graft surgery of the type that was performed on Mr. Sandidge by Dr. Nwaneri. The jury returned a verdict in Mr. Sandidge's favor on his medical malpractice claim and awarded damages in the amount

---

1. Claudication is an inflammation in the veins caused by blocked blood vessels.

of $300,000.00, but rejected his informed consent claim. Dr. Nwaneri thereafter moved for Judgment as a Matter of Law, or in the alternative, for a new trial, contending that the verdict should have been set aside and judgment entered in his favor because Dr. Woratyla failed to provide any basis for his knowledge of, or opinions as to, the national standard of care for performing composite graft knee surgery on claudicant patients. The trial court disagreed and denied Dr. Nwaneri's motion, finding that it was "without merit" and that, "in context," it was clear that Dr. Woratyla's national standard of care testimony was based on his education, training, and experience in the field of vascular surgery.

The pertinent facts revealed at trial are as follows. Dr. Nwaneri provided medical care to Mr. Sandidge, who was sixty-four years old at the time, between April 1998 and September 1998 in the District of Columbia. During the time that Mr. Sandidge was under Dr. Nwaneri's care, he suffered from pain in both legs as he walked, caused by a condition known as claudication, or inflammation in the veins. When Mr. Sandidge was first treated by Dr. Nwaneri, his condition was more serious in his right leg than in his left leg, but Mr. Sandidge was not in imminent danger of losing a limb.

On May 6, 1998, Mr. Sandidge was admitted to Greater Southeast Community Hospital ("Greater Southeast") in Washington, D.C., where Dr. Nwaneri performed surgery to alleviate blocked blood vessels above and below his right knee—which was the source of the inflammation in Mr. Sandidge's right leg. This surgery entailed an arterial bypass above Mr. Sandidge's right knee using synthetic graft material, and a second bypass below his knee using a composite graft, which is part vein and part synthetic. Following sur-

gery, Mr. Sandidge developed thrombophlebitis (inflammation of a vein that occurs when a blood clot forms) in his right leg, along with swelling, pain, and draining from the wound in his right knee. As a result of these complications, Mr. Sandidge was re-admitted to Greater Southeast on May 19, 1998.

Mr. Sandidge was admitted to Greater Southeast a third time on June 22, 1998, after complaining of complications. On June 23, 1998, Dr. Nwaneri performed a second surgery to replace the composite grafts below Mr. Sandidge's right knee in an effort to relieve a blood clot that had formed since Mr. Sandidge's first surgery. On July 1, 1998, just one week after Dr. Nwaneri performed the second graft surgery, Mr. Sandidge was taken back to the operating room at Greater Southeast for a third surgery after developing a hematoma in his right leg (a painful collection of clotted blood in a localized area of the body, usually a muscle). Mr. Sandidge was discharged from the hospital on July 18, 1998, after having had a total of three knee surgeries performed by Dr. Nwaneri.

### Dr. Woratyla's Trial Testimony

Mr. Sandidge relied solely upon the expert testimony of Dr. Woratyla, a board-certified general and vascular surgeon, to establish that Dr. Nwaneri breached the national standard of care in performing aggressive composite graft surgery on his knee when less invasive options were available.

In October 1998, after undergoing three surgeries on his right knee, Mr. Sandidge was still experiencing intense pain, swelling, and acute distress in his right leg. As a result, Mr. Sandidge sought treatment in the emergency room at the Malcolm Grow Medical Center located on Andrews Air Force Base in Maryland. It was at this time that Mr. Sandidge became a patient of Dr. Woratyla, who was then on staff as

a vascular surgeon. Mr. Sandidge was suffering from an infection on the inside of his right leg, in addition to the pain, numbness, and swelling he had been experiencing. As a result of these continued complications in his right leg, Dr. Woratyla performed a right leg bypass surgery on Mr. Sandidge to relieve his pain and swelling on October 5, 1998, and later performed two additional surgeries to alleviate subsequent complications. According to Dr. Woratyla, at the time that he performed bypass surgery on Mr. Sandidge, his condition had progressed to "limb threatening" [2] because if the right leg bypass operation was to fail, Mr. Sandidge would lose his leg. Dr. Woratyla testified that "if through some happenstance this graft [became] occluded, or it's damaged in an accident, there [was] no other option … for Mr. Sandidge." Much of Dr. Woratyla's testimony will be discussed in detail in our analysis, which can be found in section II of this opinion.[3]

## Trial Court's Ruling

After the jury returned a $300,000.00 verdict in favor of Mr. Sandidge on his negligence claim, Dr. Nwaneri moved for Judgment as a Matter of Law, or in the alternative, for a new trial. In his motion, Dr. Nwaneri claimed that Mr. Sandidge's "sole expert witness failed to explicitly state how he derived the national standard of care in the areas of vascular surgery about which he offered opinions."

The trial court denied Dr. Nwaneri's motion, finding that it was without merit. Specifically, the trial court determined:

Plaintiff's [Mr. Sandidge] expert was qualified as an expert in vascular surgery without objection. Every opinion offered was asked and answered in terms of what the national standard of care required and whether Defendant's conduct violated the national standard of care. This was certainly true with regard to the witnesses' testimony that a below-the-knee bypass was contraindicated for a claudicant such as Plaintiff, who was not at risk of losing his limb, and his testimony that the use of a composite graft … below-the-knee violated the national standard of care.

## II. Legal Analysis

Appellant, Dr. Nwaneri, argues that Dr. Woratyla failed to identify an "independent basis" for his knowledge of a national standard of care, or his opinion testimony regarding the use of a composite graft on a claudicant who was not in imminent danger of losing a limb. According to Dr. Nwaneri, the questions asked by Mr. Sandidge's trial counsel to Dr. Woratyla simply assumed the existence of a national standard or asked Dr. Woratyla to state the standard without providing a reference point or basis for that standard. We agree.

We review a Motion for Judgment as a Matter of Law *de novo*. *See Snyder v. George Wash. Univ.*, 890 A.2d 237 (D.C.2006). "A [Motion for Judgment as a Matter of Law] is proper only if there is no evidentiary foundation, including all rational inferences from the evidence, by which a reasonable juror could find for the

---

2. Dr. Woratyla testified that claudication, or pain with walking, was not a limb threatening condition, but was a relatively benign condition that most people could manage with lifestyle changes, i.e. stop smoking, diet, and exercise. However, if the condition is left alone, "over time a wound will occur or gan-

grene will occur, and that would be what we call a limb threatening condition."

3. Dr. Nwaneri offered two expert witnesses on the issue of the national standard of care— an interventional radiologist and a vascular surgeon.

party opposing the motion, considering all the evidence in the light most favorable to that party." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C.2002) (citation omitted).

■ In a medical malpractice action, the plaintiff carries the burden of establishing, through expert testimony, "the applicable standard of care, deviation from that standard, and a causal relationship between the deviation and the injury." *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C.1996). In the District of Columbia, the applicable standard of care in a medical malpractice action is "a national standard, not just a local custom." *Id.* In order to establish a national standard, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C.2006) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984) (citing *Morrison v. MacNamara*, 407 A.2d 555, 560–65 (D.C. 1979))).

■ The "purpose of expert testimony is to avoid jury findings based on mere conjecture or speculation." *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990) (citations omitted). Therefore, we have consistently held that "[t]he personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care." *Strickland, supra*, 899 A.2d at 770 (internal quotation marks and citations omitted). Instead, the testifying expert must establish that a particular course of treatment is followed nationally either through "reference to a published standard, [discussion] of the described course of treatment with practitioners outside the District ... at seminars or con-

ventions, or through presentation of relevant data." *Id.* (internal citations omitted) (quoting *Hawes v. Chua*, 769 A.2d 797, 806 (D.C.2001)); *see also Travers, supra*, 672 A.2d at 568–69; *Snyder, supra*, 890 A.2d at 241 n. 3.

### A Legally Sufficient Foundation Was Not Laid for Dr. Woratyla's National Standard of Care Testimony.

■ In an effort to determine whether the trial judge erred in allowing Dr. Woratyla's expert testimony regarding the national standard of care in treating claudicants who are not in danger of losing a limb, a summary of our four leading cases on this issue is appropriate. We begin our analysis with *Travers*, where we concluded that the testimony offered by the medical expert in support of his opinion regarding treatment with aspirin after a splenectomy amounted to his personal opinion. *See Travers, supra*, 672 A.2d at 569. We expressed our concern that "the only evidence that the expert had been exposed to the practice of medicine outside the District was his six-month employment with the Department of Defense in 1961 as a 'civilian officer' at Fort Meade in Maryland." *Id.* at 569 n. 2. We affirmed the trial court's grant of judgment in favor of the hospital because the expert's testimony was insufficient to establish the existence of a national standard of care regarding post-splenectomy treatment, specifically related to administering aspirin. *Id.* at 570.

Significant to our holding in *Travers* was the fact that appellant's expert witness admitted that he may or may not have discussed splenectomy surgery at various national conferences that he attended, or among colleagues, other than with five or six other general surgeons in the Washington metropolitan area. *Id.* at 569–70. The fact that the expert expressed a personal

opinion, as opposed to a national one, was obvious on several occasions during his trial testimony. For example, when the expert was asked on cross-examination "whether 'it was [his] testimony ... that [the giving of aspirin] [was] mandatory,'" the expert replied, "For me it is." *Id.* Also significant was the expert's inability "to specify any published medical standards, manuals, or protocols to support his opinion." *Id.* at 569. As such, we concluded that the expert simply failed to provide any factual basis for his assertion that his testimony reflected a national standard.

Five years after our decision in *Travers*, we articulated in *Hawes* a more precise standard for determining admissibility of expert testimony regarding the national standard of care in a medical malpractice claim.[4] At trial, Dr. Hill, defendants' expert, testified that: "he was licensed in the District of Columbia, Maryland, and Virginia; he had a practice in obstetrics and gynecology; graduated from Mount St. Mary's College in Maryland, and Georgetown University Medical School; completed his residency at Georgetown Hospital; was board certified at the time of trial; and served as an associate clinical instructor at Georgetown." *Hawes, supra,* 769 A.2d at 801. Dr. Hill also testified that he kept up to date on developments in obstetrics and gynecology, as well as with his medical education and residency training. Before stating his professional opinion, Dr. Hill indicated that he had reviewed the medical records of appellant and the depositions of the doctors in the case. Trial counsel asked Dr. Hill during direct examination, whether, "[b]ased upon all that [he

had] reviewed ... [was he] able to form an opinion, ... base[d] and express[ed] on a reasonable degree of medical certainty, as to whether or not the overall management of this pregnancy of [sic] Drs. Chua and Kleiman did or did not meet appropriate standards of care for a nationally board certified obstetrician in 1994?" *Id.* at 802. Dr. Hill replied: "I think that they did meet the standard, yes." *Id.*

In regard to Dr. Hill's national standard of care testimony, we concluded in *Hawes* that:

> Dr. Hill's testimony was at least *minimally sufficient* for admission into evidence since he testified as a board certified obstetrician and gynecologist; kept abreast of 'the state of the medical art [in] obstetrics and gynecology,' attended national meetings; was familiar with, and *based his opinions on,* the literature of his specialty, as well as the standards of care, including those of the American College, applicable to a reasonable obstetrician and gynecologist who undertakes the management of twin pregnancies. Moreover, we cannot say that Dr. Hill's opinions were based on nothing more than speculation or conjecture, nor merely constituted his personal opinion. Therefore, we conclude that the trial judge's decision not to strike his testimony did not constitute manifest error.

*Id.* at 808 (emphasis added).

In our two more recent cases, *Snyder* and *Strickland,* we expanded upon our holdings in *Travers* and *Hawes,* recognizing that it was reasonable to "infer" from expert testimony that a medical standard

---

4. In *Hawes,* a doctor ordered sonograms near the end of appellant's twin pregnancy, which showed fetal growth problems in her twins. Although appellant complained of reduced fetal movement, the doctor waited ten days after appellant's last sonogram until he performed an emergency caesarean. Appellant's twins were stillborn, having died in utero one to two days earlier. Appellees (doctors) relied on their expert, Dr. Hill, to testify as to the proper course of care and treatment for identical twins exposed to a risk of twin-to-twin transfusion syndrome, later discovered to be the twins' cause of death. *See* 769 A.2d 797.

is nationally recognized, so long as the testimony presents a sufficient basis upon which an inference can be made. *See Snyder, supra,* 890 A.2d at 245; *Strickland supra,* 899 A.2d at 774. In *Snyder,* the appellant filed a medical malpractice suit against George Washington University Hospital after undergoing an angioplasty. Appellant alleged that he received negligent treatment by a hospital interventional radiologist and other medical employees during and after the angioplasty procedure, which resulted in bleeding complications and ultimately paralysis. *See* 890 A.2d at 239. The trial court directed a verdict for the hospital after finding that appellant was unable to prove causation and that the testimony of appellant's sole expert witness, Dr. Hoffler, was insufficient to establish a national standard of care or that the hospital breached a national standard. On appeal, we concluded that although Dr. Hoffler's testimony was by no means a "model of clarity," *id.* at 245, when viewing the expert testimony in a light most favorable to the appellant, the expert's testimony was legally sufficient to establish a national standard of care. *Id.* In reaching this conclusion in *Snyder,* we found the following factors significant:

> Dr. Hoffler explained that during his forty years of practice as a board-certified general surgeon and a fellow of the American College of Surgeons, he had encountered patients who experienced internal bleeding ... which required him to diagnose and treat the bleeding. *He testified that his knowledge* of the national standard of care *was "based on* [his] personal experience, [his] education, the frequent meetings [ ], the College of Surgeons meetings, [and] things that [they] have to do when [they] become certified by the Joint Commission." Although he had not, himself, ever encountered a patient suffering from internal bleeding ... he testified

that "the literature is full of it" and that he made "every effort" to keep up to date on the literature with regard to the national standard on treating and managing these bleeding complications. Dr. Hoffler further testified that he was familiar with the national standard required after a patient has undergone an interventional procedure, such as that involved in this case. He explained that the *basis for his knowledge* in this area was his "[e]ducation, experience, continued discussions about these matters in hospital staff meetings, surgical society meetings, [and] in the medical journals...." With respect to his familiarity with the national standards of care pertaining to the requirement to investigate and evaluate the complaints of patients, Dr. Hoffler again reiterated that his knowledge *was based on* "education ... experience ... training, what other people who are knowledgeable about such things say and write."

*Id.* at 246 (emphasis added). We concluded that Dr. Hoffler's opinion "reflected evidence of a national standard and was 'not ... based upon [his own] personal opinion, nor mere speculation or conjecture,'" *Id.* at 246 (citing *Hawes, supra,* 769 A.2d at 806), and was legally sufficient to prove a national standard of care and a breach of that standard by the hospital.

Lastly, in *Strickland,* our most recent case on this issue, we held that the expert testimony there failed to establish a national standard of care because the expert failed to state a *basis* for his testimony beyond that of his personal opinion. In *Strickland,* appellant, decedent's mother, filed a medical malpractice suit after her daughter, and her daughter's fetus, died shortly after doctors performed an emergency caesarean. *Strickland, supra,* 899 A.2d at 772. Appellant brought suit against the doctors alleging that they

breached the national standard of care in failing to perform additional tests on the decedent prior to the emergency caesarean, which would have likely prevented her death. Appellant relied on an expert witness at trial to prove that the doctors' treatment of decedent fell below the national standard of care. Early on in the expert's testimony, the doctors objected on the grounds that an adequate foundation had not been laid to provide the basis for the expert's testimony. In response, the trial judge directed the expert to "start more from the beginning [of] how he [became] aware that a standard of care applies to the situation before [getting] to the standard of care." *Id.* at 773. At the close of appellant's evidence, the trial court granted the doctors' Motion for Judgment on the grounds that appellant's expert had failed to establish a basis for his opinion as to the national standard of care.

We affirmed the trial court's ruling in *Strickland,* concluding that even when viewed in the light most favorable to the appellant, the expert witness's testimony was insufficient to establish a national standard of care. We concluded in *Strickland* that the only attempt made by the expert to reference a national standard of care during his testimony "was by stating in rather general terms that his opinion was '[w]hat other similarly trained doctors would have done under similar circumstances', or that it was the 'standard of care what doctors do in hospitals around the country.'" *Id.* at 774 (internal quotation marks omitted). Significant to our holding in *Strickland* was the fact that even after the trial judge directed the expert to "start more from the beginning [of] how he [became] aware that a standard of care [applied] to the situation," *Id.* at 773, the expert failed to even attempt to link his national standard of care testimony to "any certification process, current literature, conference, or discussion with

other knowledgeable professionals," any of which would have been legally sufficient to establish a basis for his discussion of the national standard of care. *Id.* Without a basis for his testimony, or any supplemental support for that matter, we concluded in *Strickland* that the expert's testimony amounted to nothing more than his own personal opinion. *See id.* at 774.

Applying the legal principles from the preceding line of cases to the case at bar, we conclude that here, because Dr. Woratyla was never specifically asked what was the "basis" for his knowledge of the national standard of care, or what was the "basis" for his opinions that appellant deviated from the national standard, a legally sufficient foundation for his expert opinion testimony was never established. Absent testimony from Dr. Woratyla regarding the basis for his national standard of care testimony, there was an insufficient basis for the trier of fact to reasonably infer what his testimony was based on, and the trial court was left to speculate.

Dr. Woratyla's testimony is distinguishable from that of the experts in both *Hawes* and *Snyder,* where we concluded that a legally sufficient basis was established for the expert's national standard of care testimony. In *Hawes,* we "reiterate[d] that it is insufficient for a defense expert's standard of care testimony to merely recite the words 'national standard of care.'" *See* 769 A.2d at 799. In the instant case, the record reflects numerous instances where Mr. Sandidge's trial counsel inserted the words "national standard of care" into many of the questions posed to Dr. Woratyla. For example, appellee's trial counsel asked Dr. Woratyla the following questions, *inter alia,* during direct examination:

**Mr. Nappo (Trial counsel for appellant):** Bearing in mind the *national*

standard for vascular surgeons, do you have an opinion as to whether a claudicant in this situation is—would be at a stage of the disease where he needs immediate surgery?

**Dr. Woratyla:** I do—

**Mr. Montedonico (Trial counsel for appellee):** Objection, Your Honor. Lack of foundation.

**The Court:** I'll permit the question.

* * *

**Dr. Woratyla:** Well, the national standard of care would clearly state that a patient with that vascular condition who is a claudicant would not need immediate surgery, would not need surgery at all, really.

* * *

**Mr. Nappo:** I'll ask it this way, according to the—your understanding of the national standards of care, should a composite graft as you've described, part synthetic material and part vein, should that ever be utilized to relieve a claudicant and extend from the femoral artery to below the knee?

**Mr. Montedonico:** Objection. Again, lack of foundation.

**The Court:** Overruled. You may answer.

* * *

**Dr. Woratyla:** No. That would not— that would be well below the standard of care to configure a graft such as this for a claudicant. [Appx. 74]

* * *

**Mr. Nappo:** And under national standards, absent the threat of imminent amputation, what is the accepted method of going from femoral to below the knee?

**Dr. Woratyla:** In a person who presents with again claudication, okay, the national standard would accept only a single piece of good quality saphenous vein to bypass the knee to a tibial artery.

* * *

**Mr. Nappo:** According to the standards of care, the national standards of care, again, in your opinion, would after performing this type of surgery in this situation upon this claudicant be a breach of the national standard of care?

**Mr. Montedonico:** Objection

**The Court:** Overruled.

**Dr. Woratyla:** It would.

As we held in Hawes, "we do not understand any of our opinions, read in their totality, to declare that, in a medical malpractice case, a mere recitation of the words 'national standard of care' is minimally sufficient to permit the admission of the expert's testimony." 769 A.2d at 807. Therefore, the mere insertion of the words "national standard of care" into questions posed to Dr. Woratyla by appellee's trial counsel did not satisfy the requirement of establishing the basis for his knowledge of the national standard of care.

In Hawes, where we held that the expert's testimony was only "minimally sufficient for admission into evidence," the expert was at least asked the question: "What is the basis or why do you say the fetal heart rate is the first to go," to which the expert responded "It's stated in textbooks, it's known through research, that fetal reactivity, whether in labor or monitoring a pregnancy, fetal heart reactivity is usually almost always flattened when there is an illness or some kind of compromise to that fetus." 769 A.2d at 802. Also, during cross-examination, the expert in Hawes referenced "literature, meetings, national meetings and the American College as a basis for his opinion." Id. In the instant case, Dr. Woratyla was never asked what the basis was for his knowledge of the national standard of care regarding the

surgical treatment of clauidicant patient, or the basis for his opinion about whether it was followed in this case.

We note that there is one instance in the trial court record where Dr. Woratyla was asked during direct examination a "basis" for his opinion, and he listed a basis for his proffered opinion. However, this testimony was specifically related to the national standard of care regarding the duty of a vascular surgeon to monitor or give follow-up care to a claudicant patient, such as Mr. Sandidge, after being discharged from a hospital. The testimony is as follows:

> **Mr. Nappo:** And reviewing that record and considering Mr. Sandidge's deposition, do you have an opinion whether this Defendant surgeon discharged that duty in accordance with the standard of care?
>
> **Dr. Woratyla:** Yes, I do.
>
> **Mr. Nappo:** What is that opinion?
>
> **Dr. Woratyla:** ... [I]t would appear in reviewing the records that that standard was not met.
>
> **Mr. Nappo:** *And what is the basis for your opinion?*
>
> **Dr. Woratyla:** The basis is, again, reviewing of the available notes and the depositions of the Plaintiff, that the Plaintiff was having problems with his leg and had a difficult time reaching or getting ahold of Dr. Nwaneri and therefore did not feel that he was getting the care he needed.

This testimony, however, still does not suffice as a legally sufficient foundation for opinion testimony on the national standard of care. Dr. Woratyla lists as his basis for his opinion the notes, depositions, and personal feelings of Mr. Sandidge, and does not make "reference to a published standard, [discussion] of the described course of treatment with practitioners outside the District ... at seminars or conventions, or through presentation of relevant data,"

which we have consistently held is sufficient to prove the basis for an applicable standard of care. *Strickland, supra,* 899 A.2d at 770 (internal quotation marks and citations omitted).

Moreover, Dr. Woratyla failed to make any reference to his opinion being based on textbooks, research, meetings, or conversations with other vascular surgeons. Instead, while being qualified as an expert, Dr. Woratyla testified that the journals he "regularly receive[d] are journals that relate to vascular surgery," such as the *Journal of Vascular Surgery,* the *Journal of Endovascular Surgery,* and the *New England Journal of Medicine.* Dr. Woratyla also testified, while being qualified as an expert, that he "published a paper relating to lower extremity vascular disease." However, there is no evidence that the journals Dr. Woratyla received, or the abovementioned paper, contained information about the national standard of care, or revealed what that standard was. Nor did Dr. Woratyla give any testimony indicating whether these journals, or his published article, were national, peer-reviewed publications that recognized a national standard of care for vascular surgeons.

Notwithstanding Dr. Woratyla's impressive curriculum vitae, before the jury could hear his opinion regarding the national standard of care, Dr. Woratyla needed to provide an independent basis for his expert opinion testimony establishing some basis for his knowledge that the national standard of care was what Dr. Woratyla said it was.

Dr. Woratyla's qualifications, alone, were insufficient to demonstrate knowledge of the applicable standard of care. *See Strickland, supra* 899 A.2d at 774 (finding without merit appellant's argument that the expert's educational and professional background was sufficient to

demonstrate a knowledge for his national standard of care testimony was without merit.). For example, when Dr. Woratyla testified that it is below the national standard of care to perform composite graft surgery on a claudicant such as Mr. Sandidge, Dr. Woratyla was asked "what is the reason that ... would be below the standard of care," to which Dr. Woratyla responded: "The reason that would be below the standard of care is because this graft configuration has many areas where it could fail...." Dr. Woratyla, even when given an opportunity to base his opinions on literature, meetings, or even his own educational training and experiences, failed to do so. Thus, even when viewed in context, we are unable to infer from Dr. Woratyla's testimony what the basis was for his national standard of care testimony. Instead, we would be forced to make an impermissible leap or to speculate. See, *e.g., Curry v. United States,* 520 A.2d 255, 263 (D.C.1987) ("[E]vidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.") (citing *Shelton v. United States,* 505 A.2d 767, 770–71 (D.C.1986)); *see also Washington Hosp. Ctr., supra,* 579 A.2d at 181; *Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.1981); *District of Columbia v. Davis,* 386 A.2d 1195, 1201 (D.C. 1978).

Additionally, Dr. Woratyla testimony during cross examination that he knew other surgeons were performing minimally invasive surgery on claudicant patients who were not in danger of losing a limb, was insufficient to establish a national standard of care:

> **Mr. Montedonico:** ... [D]o you know whether or not it was used, the standard around the country, minimally invasive treatment, for peripheral vascular disease?

> **Dr. Woratyla:** In what respect?

> **Mr. Montedonico:** Well, do you know whether or not it was used here in Washington, D.C. for example, at Georgetown, at Howard University, where my client practices, at Greater Southeast?

> **Dr. Woratyla:** I do know for a fact about the use in Washington, D.C. Specifically, at Howard University I do know for a fact.

> * * *

> Because ... I know ... at that time surgeons, vascular surgeons, who worked in hospitals in this area and were performing those procedures.

Although it is clear from this testimony that Dr. Woratyla knew of other *local* surgeons performing less invasive surgery on patients suffering from claudication, Dr. Woratyla "did not relate any basis for a further statement that other physicians around the country held the same viewpoint." *Travers, supra,* 672 A.2d at 569.

Quite significantly, Dr. Woratyla was never asked by Mr. Sandidge's trial counsel, in explicit terms, what the "basis" for his national standard of care testimony was regarding the treatment of claudicant patients, and Dr. Woratyla never provided one. We do recognize, however, that this omission, standing alone, will not automatically result in an expert's testimony being deemed inadmissible at trial. Instead, "[o]ur primary concern is whether '[i]t is reasonable to infer from [the] testimony that such a standard is nationally recognized.'" *Snyder, supra,* 890 A.2d at 245 (citing *Phillips v. District of Columbia,* 714 A.2d 768, 775 (D.C.1998)).

Mr. Sandidge argues that Dr. Woratyla's educational and professional experiences and background were sufficient to demonstrate a basis for his national stan-

dard of care testimony. He contends that because Dr. Woratyla's curriculum vitae indicates that he was the lead author, in collaboration with six other doctors, of an article titled *The Performance of Femoropopliteal Bypasses Using Polytetrafluoroethylene Above the Knee versus Autogenous Vein Below the Knee*, which was published in 1997 in the American Journal of Surgery, we can infer that he was familiar with the national standard of care for claudicant patients. However, although we know that Dr. Woratyla presented the abovementioned article at the 1997 Society for Clinical Vascular Surgery Conference in Florida, and that he co-authored five other publications on vascular surgery with twenty other doctors, there is no evidence that these articles were discussed by Dr. Woratyla during his testimony as a basis for his opinions, so we are left to speculate as to what the articles actually say based solely on the title listed in his curriculum vitae.

Similarly, we know from his testimony and from his curriculum vitae that Dr. Woratyla received medical training in Pennsylvania, Connecticut, New York, and Maryland; and that he made presentations at medical meetings and conventions outside of Washington, D.C., including presentations before the Connecticut Society of the American Board of Surgeons, The Eastern Vascular Society in Newport, R.I., and The Society for Military Vascular Surgery in Bethesda, MD. However, we are left to impermissibly speculate as to whether these societies adhered to a national standard of care, and therefore, formed the basis for Dr. Woratyla's knowledge of the national standard of care. We agree that Dr. Woratyla was indeed qualified to meet the first threshold requirement to be qualified as an expert witness. However, we cannot conclude from this record that he met the additional requirement of establishing a foundation for his

testimony regarding the national standard of care in below-the-knee graft surgery and his opinion that Dr. Nwaneri's actions fell below this standard.

Lastly, we note that, as pointed out by appellant, and as the court ruled at trial, Mr. Sandidge's trial counsel established a basis for the existence of Dr. Woratyla's national standard of care testimony on the informed consent claim as follows:

**Mr. Nappo:** Dr. Woratyla, are you familiar with the national standards of practice of the vascular surgery—

**Dr. Woratyla:** Yes

**Mr. Nappo:**—as it pertains to informing patients of their options on these first visits?

**Dr. Woratyla:** Yes, I am.

**Mr. Nappo:** Is there a national standard that guides that?

**Dr. Woratyla:** Well, there is—*there is a standard that is taught to all trainees during their residency* training as to how to inform a patient appropriately of the procedure and the condition that they have.

**Mr. Nappo:** And what is that standard of information? What is supposed to be disclosed to the patient in the situation like this?

(Emphasis added.) Defense counsel then lodged an objection to the preceding question based on "lack of foundation." In response to counsel's objection, the trial judge stated: *"Well, I think he said that— if it's taught to all trainees everywhere, I assume it's an actual standard.* I'll let him testify. Go ahead, sir." The trial court next permitted the following question with respect to the national standard of care regarding the treatment of claudicants who are not at risk of losing a limb:

**Mr. Nappo:** Bearing in mind the national standard for vascular surgeons, do

you have an opinion as to whether a claudicant in this situation is—would be at a stage of the disease where he needs immediate surgery?

**Dr. Woratyla:** I do—

Defense counsel again objected based on "lack of foundation." The court again overruled the foundation objection, and stated: "I'll permit the question."

Based on this colloquy, by overruling defense counsel's objections to plaintiff's questions to Dr. Woratyla about the national standard of care, the trial judge may have led Mr. Nappo, Mr. Sandidge's trial counsel, to reasonably believe that it was not necessary to present additional evidence which Mr. Nappo might have sought to introduce had the foundation-based objections been sustained. *See, e.g., Miller–McGee v. Wash. Hosp. Ctr.,* 920 A.2d 430, 438–439 (D.C.2007) (because the trial judge permitted the plaintiff to proceed on a claim of lack of informed consent on the original pleading, the plaintiff could reasonably conclude that no further amendment to the complaint was needed to keep that claim alive). Thus, a directed verdict for Dr. Nwaneri is not the proper remedy where appellee's trial counsel may have reasonably concluded that the expert, Dr. Woratyla, laid a sufficient foundation when the trial court overruled appellant's objections as to lack of foundation.

Accordingly, we conclude that appellee failed to establish a sufficient foundational basis for his expert's knowledge of the applicable national standard of care, or a basis for the expert's opinion that appellant's treatment of Mr. Sandidge fell below the national standard. However, because appellee's trial counsel may have reasonably concluded that there was no need to go further in providing a sufficient basis for the expert's opinion after the trial court overruled the foundational objection,

we reverse the judgment of the trial court, and remand for a new trial.

*So ordered.*