Beatriz CÁRDENAS and Francisco
Camacho, Appellants,

v.

Scott P. MUANGMAN, M.D.
and Nathan M. Bobrow,
M.D., Appellees.

No. 07–CV–444.

District of Columbia Court of Appeals.

Argued Oct. 30, 2008.

Decided June 17, 2010.

Hugh E. Donovan, Silver Spring, MD, with whom Christine Mougin–Boal, Leesburg, VA, was on the brief, for appellants.

Andrew J. Spence, with whom Stephen L. Altman, Fairfax, VA, and Gregory S. McKee, Annapolis, MD, were on the brief, for appellee Scott Muangman, M.D.

Gregory S. McKee, Annapolis, MD, with whom Stephen L. Altman and Andrew J. Spence, Fairfax, VA, were on the brief, for appellee Nathan Bobrow, M.D.

Before RUIZ, FISHER and BLACKBURNE–RIGSBY, Associate Judges.

RUIZ, Associate Judge:

Appellants (plaintiffs at trial) appeal the trial court's grant of judgment to appellees as a matter of law in this medical malpractice case. Appellants argue that the trial court erred in determining that their expert witness lacked a sufficient basis upon which to testify about the national standard of care for a dilation and evacuation procedure. We agree with appellants on this point,[1] but we reject appellant Francisco Camacho's argument that the trial court erred in dismissing his claim for loss of consortium. Therefore, we reverse and remand with instructions that the trial court reinstate the jury verdict on the claim for medical malpractice.

## I. Facts

On December 27, 2001, appellants Francisco Javier Camacho and Beatriz Cárdenas went to the District of Columbia office of appellee, Scott P. Muangman, M.D., for an abortion after the 20–week fetus Ms. Cárdenas was carrying was diagnosed with Trisomy 21. Following the procedure, which appellants said was very painful and left Ms. Cárdenas feeling weak, they returned to their home in Virginia. Ms. Cárdenas testified that she was in significant pain throughout the evening. During the early hours of December 28, 2001, Ms. Cárdenas was taken by ambulance to Fairfax Hospital's emergency room, where it was discovered that she had sustained a ten-to-twelve centimeter laceration of the uterus which extended into the cervix, a four-to-five centimeter tear of the sigmoid colon, a tear of the right infundibulopelvic ligament, damage to the ovaries, significant blood loss, sepsis, and hemorrhagic/septic shock. As a result, Ms. Cárdenas underwent a hysterectomy, a bilateral salpingo-oophorectomy,[2] and a sigmoid colon resection with colostomy. She was released after two weeks of hospitalization, but had to return in March of 2002 for surgical reversal of the colostomy.

Appellants filed complaints for medical malpractice against Dr. Muangman and his partner in the medical office, appellee Nathan Bobrow, M.D. At trial, appellants proffered the testimony of Philippe Girard, M.D. Appellees objected that Dr. Girard did not have a basis of knowledge to testify about the national standard of care for the performance of a second trimester dilation and evacuation procedure ("D & E procedure"). The trial court initially ruled that Dr. Girard's testimony was admissible, and Dr. Girard testified that Dr. Muangman had deviated from the national standard of care by, *inter alia*, failing to use laminaria to dilate Ms. Cárdenas's cervix before attempting surgery.[3] Appellees presented

1. We therefore need not address appellants' alternative argument that a new trial is warranted because the trial court improperly dismissed their claim of lack of informed consent.

2. A bilateral salpingo-oophorectomy entails "[r]emoval of the ovary and its uterine tube."

STEDMAN'S MEDICAL DICTIONARY 1716 (28th ed. 2006) [hereinafter "STEDMAN'S"].

3. A laminaria is a "[s]terile rod made of kelp ... that is hydrophilic, and, when placed in the cervical canal, absorbs moisture, swells, and gradually dilates the cervix." STEDMAN'S, *supra* note 2, at 1046. Plaintiffs' expert, Dr.

expert testimony that they had acted consistent with the national standard of care. The jury returned a verdict in favor of appellants in the amount of $263,557.96. However, after appellees renewed their motion for judgment as a matter of law after the verdict, the trial court reversed its original ruling and concluded that Dr. Girard's testimony should not have been admitted to establish the national standard of care. Consequently, the trial judge set aside the verdict and entered judgment in favor of appellees.

## II. Admissibility and Sufficiency of Standard of Care Testimony

■ "The Court of Appeals will review a motion for judgment as a matter of law *de novo* by applying the same standard as the trial court." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C.2006). Judgment as a matter of law is proper only upon a finding that "a party has been fully heard ... and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Super. Ct. Civ. R. 50(a). Here, the trial court found, and appellants do not contest, that without the testimony of Dr. Girard, appellants could not have made a *prima facie* case for medical malpractice. Therefore, the principal issue for our review is whether, in deciding appellees' motion for judgment, the trial court properly determined that the testimony of appellants' expert was unqualified and insufficient to prove the applicable national standard of care.

■ "In a medical malpractice action, the plaintiff carries the burden of establishing ... 'the applicable standard of care, deviation from that standard, and a causal relationship between the deviation

and the injury.'" *Nwaneri v. Sandidge*, 931 A.2d 466, 470 (D.C.2007) (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C.1996)). "Because these issues are 'distinctly related to some science, profession, or occupation,' expert testimony is usually required to establish each of the elements, except where the proof is so obvious as to lie within the ken of the average lay juror." *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990) (quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987)).

*Admissibility*

■ Whether an expert is qualified to testify as to the applicable national standard of care is an issue that has received considerable attention from this court in recent years. *See, e.g., Coulter v. Gerald Family Care, P.C.*, 964 A.2d 170, 188–203 (D.C.2009); *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 322–28 (D.C.2007); *Nwaneri*, 931 A.2d at 470–78; *Strickland*, 899 A.2d at 773–74; *Snyder v. George Washington Univ.*, 890 A.2d 237, 243–46 (D.C.2006); *Hawes v. Chua*, 769 A.2d 797, 801–08 (D.C.2001). As these cases have noted, a proper determination that an expert is qualified to testify as to the applicable standard of care does not vary depending upon whether the expert is proffered by the plaintiff or the defendant. The proffered expert's testimony "must meet basic standards of competency and relevancy," address national norms, and not be based merely on local custom or personal opinion. *Hawes*, 769 A.2d at 806. This requirement is founded on the prerequisite that *any* expert testimony not be based on mere speculation or conjecture. *See Washington*, 579 A.2d at 181; *see also*

---

Girard, testified that a laminaria is used during an abortion and sometimes for inducing labor, for the purpose of gently dilating the cervix. He further testified that rather than

use laminaria, Dr. Muangman used mechanical dilators to effect a dilation when he performed Ms. Cárdenas's procedure.

*Nwaneri,* 931 A.2d at 470; *Strickland,* 899 A.2d at 773–74; *Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 367 (D.C.1980) ("An expert witness opinion must be based on fact or adequate data. It is properly received so long as it is not a mere guess or conjecture. While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted."). In *Hawes* we summarized the minimum requirements for expert testimony on the national standard of care as follows: "(1) it is insufficient for an expert's standard of care testimony to merely recite the words 'national standard of care'; [4] (2) such testimony may not be based upon the expert's personal opinion, nor mere speculation or conjecture; and (3) such testimony must reflect some evidence of a national standard." 769 A.2d at 806. Once an expert meets these minimum requirements, he or she may properly testify as to the national standard of care. *See Aikman v. Kanda,* 975 A.2d 152, 160–62 (D.C.2009). We review a trial court's decision on the admissibility of expert testimony for abuse of discretion. *See Hawes,* 769 A.2d at 801.

*Sufficiency*

 Whereas experts for both parties must meet these minimum requirements to be qualified to testify about the national standard of care, the plaintiff's experts, and only the plaintiff's experts, also have to hurdle a higher threshold: the burden of proving the national standard of care by a preponderance of the evidence.[5] Plaintiff's expert, in other words, must not only be qualified to testify about the national standard of care, but must also present evidence that is sufficient to enable the fact-finder to find the national standard of care by the requisite evidentiary standard. To overcome a challenge to the sufficiency of his or her evidence under Rule 50 (judgment as a matter of law), therefore, a plaintiff is required to show that a reasonable juror could fairly conclude that the expert testimony about the national standard established by a preponderance of the evidence "the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Strickland,* 899 A.2d at 773 (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984)); *see Hill,* 933 A.2d at 325 and *Nwaneri,* 931 A.2d at 470 (quoting *Strickland,* 899 A.2d at 773); *Washington,* 579 A.2d at 183 (holding that based on the evidence, "a reasonable juror could find that the standard of care required [the hospital] to supply [carbon dioxide] monitors as of November 1987"); *cf. Weisgram v. Marley Co.,* 528 U.S. 440, 447–48, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (noting that the purpose of Federal Rule of Civil Procedure 50 is to "allow[ ] the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result' " (quoting 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2521, at 240 (2d ed. 1995))). Unlike the question of admissibility which is entrusted to trial court discretion, the issue of sufficiency is one of law and "we are not bound to follow the trial court's rulings

---

4. "On the other hand, the fact that an expert 'did not expressly use the words "national standard" when stating his expert opinion does not, in itself, render his opinion inadmissible'; rather, '[o]ur primary concern is whether it is reasonable to infer from [the] testimony that such a standard is nationally recognized.' " *Coulter,* 964 A.2d at 189 (alterations in original) (quoting *Snyder,* 890 A.2d at 245).

5. Thus, an expert who presents sufficient evidence of the national standard of care necessarily satisfies the elements necessary to qualify as an expert on the national standard of care, but not *vice versa.*

on the sufficiency of the evidence to withstand a directed verdict." *Snyder,* 890 A.2d at 245. Moreover, in considering sufficiency of evidence, we review the grant of judgment in the light most favorable to the opponent of the motion for judgment. *See Travers,* 672 A.2d at 568.

"In *Hawes* ... we examined this court's medical malpractice cases ... and identified 'at least seven legal principles [which] are important in assessing the *sufficiency* of national standard of care proof....' " *Drevenak v. Abendschein,* 773 A.2d 396, 416 (D.C.2001) (alteration in original) (emphasis added). These principles are:

> First, the standard of care focuses on the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances. Second, the course of action or treatment must be followed nationally. Third, the fact that [particular] physicians follow a national standard of care is insufficient in and of itself to establish a national standard of care. Fourth, in demonstrating that a particular course of action or treatment is followed nationally, reference to a published standard is not required, but can be important. Fifth, discussion of the course of action or treatment with doctors outside this jurisdiction, at seminars or conventions, who agree with it; or reference to specific medical literature may be sufficient. Sixth, an expert's personal opinion does not constitute a statement of the national standard of care; thus a statement only of what the expert would do under similar circumstances ... is inadequate. Seventh, national standard of care testimony may not be based upon mere speculation or conjecture.

*Hawes,* 769 A.2d at 806 (second alteration in original) (citations and internal quotation marks omitted).

Subsequent to *Hawes,* we have restated these principles in various formulations. *See Strickland,* 899 A.2d at 773 ("The personal opinion of the testifying expert as to what he or she would do in a particular case ... is insufficient to prove the applicable standard of care." (quoting *Travers,* 672 A.2d at 568)); *Coulter,* 964 A.2d at 189 ("Further, an expert's educational and professional background is not sufficient to demonstrate that he is familiar with the national standard of care."); *id.* ("[T]he testifying expert must establish that the relevant standard of care is followed nationally, 'either through reference to a published standard, discussion of the described course of treatment with practitioners outside the District at seminars or conventions, or through presentation of relevant data.' " (quoting *Strickland,* 899 A.2d at 773–74)). Importantly, the expert must "*link* his testimony to [a] certification process, current literature, conference or discussion with other knowledgeable professionals," at a national level, otherwise there is no "basis for his discussion of the national standard of care." *Strickland,* 899 A.2d at 774 (emphasis added); *see also Coulter,* 964 A.2d at 189; *cf. Nwaneri,* 931 A.2d at 467, 475, 477.

### III. Analysis of Appellants' Expert's Testimony

Because the requirements for qualifying an expert to testify and assessing the qualified expert's testimony for sufficiency overlap, they are susceptible to being confused. Thus it is essential to keep in mind the context and purpose for which an expert's testimony is challenged. In this case, the issue is complicated by the fact that although the trial judge granted judgment to appellees post-verdict, which we review *de novo,* the judge ruled that judgment was warranted because "[i]f the expert had not been qualified, that is, if he

had not been allowed to testify as an expert witness on the standard of care applicable to the facts of the case, plaintiffs' case would necessarily have been dismissed." As previously noted, a ruling on admissibility is reviewed for abuse of discretion. Likening the testimony of Dr. Girard to that of the defendants' expert, Dr. Hill, in *Hawes*, the trial court noted that although Dr. Hill's testimony "was at least minimally sufficient," 769 A.2d at 808, "[had] Dr. Hill ... been offered by [a] plaintiff it is likely that ... the *Hawes* court would not have upheld his qualification." The important distinction, the trial court noted, was "the standard properly used to evaluate the testimony of each doctor." Although we agree with the thrust of the trial court's comment—that a plaintiff's expert must meet a standard of sufficiency above and beyond mere qualification to testify—we disagree that the distinction between plaintiffs' and defendants' experts comes into play with respect to qualification to testify, the asserted reason for the trial court's decision to grant judgment to appellees in this case. In this regard, in deciding appellees' Rule 50 motion for judgment, the trial court essentially collapsed the admissibility and sufficiency standards into one, recognizing that appellant had presented a single expert who, if unqualified to testify, could not as a matter of law satisfy the sufficiency standard. See note 5, *supra*. We therefore review the trial court's ruling *de novo*.

 Regarding admissibility, we note first that Dr. Girard's opinion was not based merely on his own personal experience. Upon being asked after having been recalled to the stand on *voir dire* "how [he

is] familiar with the standard of care throughout the country," Dr. Girard responded:

> Well that's a hard question. It's a conglomeration of things. What you see in journals, what you've read in textbooks, what you've learned from, you know, being exposed to them to talking to people who do [D & E procedures]. From doing [D & E procedures] myself. I can't put my finger on exactly what defines how, you know, where I get my information, but it's just like anything else we do in life. It's a conglomeration of events and sources of information.

Dr. Girard explained that his opinion was based on his familiarity with medical literature, national in scope, including *Obstetrics & Gynecology*, the official publication of the American College of Obstetricians and Gynecologists ("ACOG"); the *American Journal of Obstetrics and Gynecology*; and various textbooks that contain "sections on second trimester abortions." He referred to speakers "[f]rom all over the country, California, Michigan ... New York" who come to grand rounds at the Medical College of Virginia[6] where Dr. Girard is on the faculty. He also said that his opinion was based on his attendance at national and international meetings, including repeated attendance at the annual ACOG meeting. Furthermore, he stated that while attending these meetings, he had discussed second trimester abortions with other physicians from "[v]arious areas in the country," although he had never attended a meeting in which second trimester abortion procedures were specifically the topic of focus.[7] This testimony

---

6. The Medical College of Virginia is part of Virginia Commonwealth University.

7. We note that some of Dr. Girard's testimony was presented during his *voir dire*, outside the presence of the jury. The trial court expressly

took into account all of Dr. Girard's testimony in granting judgment to appellees. Neither party objected at trial. The parties do not argue, and therefore we do not decide, what effect Dr. Girard's having presented some of his testimony outside the presence of the jury

amply met the minimum requirements set forth in *Hawes* for qualification to testify. *See* 769 A.2d at 806; *Nwaneri*, 931 A.2d at 473 (listing "discussion with other knowledgeable professionals" in a list of credentials "*any* of which would have been legally sufficient to establish a basis for [expert's] discussion of the national standard of care" (emphasis added) (quoting *Strickland*, 899 A.2d at 774)).

Moreover, we further conclude that Dr. Girard's testimony was sufficient to permit the jury to find (as it did) that appellants proved the national standard of care by a preponderance of the evidence.[8] Dr. Girard explained in considerable detail the purpose and method of use of laminaria for dilation of the cervix in a second trimester abortion procedure:

> [T]he second trimester fetus is so large that instead of struggling against a cervix that's been dilated in the last minutes, one prefers always to have a cervix that's open and wide so that less twisting, pulling and activity is needed to remove the fetus.
>
> This is the same in what's called a D & X procedure[ ] where there's two days of laminarias that are placed, and then the fetus is just kind of removed. It also decreases the amount of pain from the dilation that's performed in the office.

A closer question is whether Dr. Girard satisfied the requirement that he "link" his expert testimony about the use of laminaria to national practices. *Strickland*, 899 A.2d at 774. Although Dr. Girard could have been better prepared to explain the link between his opinion on the use of laminaria for second trimester abortions and its basis in national practice, we conclude that his testimony sufficed to establish the necessary connection. *See Snyder*, 890 A.2d at 245 ("Our primary concern is whether '[i]t is reasonable to infer from [the] testimony that such a standard is nationally recognized.'" (quoting *Phillips*, 714 A.2d at 775)). For example, Dr. Girard's testimony was not as parochial as the testimony of Dr. Woodyear in *Coulter*, which this court held deficient because it was based only upon the expert's personal, albeit extensive, experience. *See Coulter*, 964 A.2d at 191 (noting that "nothing in [the proposed expert's] testimony established that he attended national conferences, or kept current with pertinent medical literature, from which he could be familiar with the *national* standard of care"); *see also Travers*, 672 A.2d at 569–70 (rejecting the testimony of an expert as to the national standard of care where "the expert expressed a personal opinion rather than a national standard of care"). Nor is Dr. Girard's testimony like that of Dr. Stark, the plaintiff's expert in *Strickland*, who stated "in rather general terms that his opinion was '[w]hat other similarly trained doctors would have done under similar circumstances,' or that it was the 'standard of care what doctors do in hospitals around the country.'" *Strickland*, 899 A.2d at 774 (alteration in original); *see also Travers*, 672 A.2d at 569–70 (upholding grant of judgment under Rule 50 where plaintiff's expert "failed to provide *any* factual basis for his assertion that his testimony reflected a national standard

---

ought to have had on our subsequent review of the trial court's grant of judgment. In terms of our review of the trial court's ruling, however, the testimony is properly before us. *See Snyder*, 890 A.2d at 246 (noting that during *voir dire*, plaintiff's expert "indicated that any subsequent testimony regarding the stan-

dard of care ... would reflect a national standard").

8. As noted, *supra*, note 5, the trial court's ruling that the expert was unqualified to testify necessarily implied that the expert's testimony was insufficient as a matter of law.

other than his conversations with five or six colleagues within the District" (emphasis added)).

Rather, Dr. Girard's testimony is more like that of Dr. Hoffler, plaintiff's expert in *Snyder*, which we concluded was "legally sufficient." 890 A.2d at 245. In that case, plaintiff's expert explained "that the basis for his knowledge in this area was his '[e]ducation, experience, continued discussions about these matters in hospital staff meetings, surgical society meetings, in the medical journals.'" *Snyder*, 890 A.2d at 246 (alteration in original). Here, Dr. Girard was specifically asked about the source of his opinion on the use of laminaria in performing second trimester abortions:

Q. Have you had occasion to discuss second trimester abortions with other physicians?

A. I have.

Q. Have you discussed whether laminaria was [used] with them—by them?

A. You know, at which time are you talking about? It's—

Q. At any time in your life?

A. Yeah, I have.

Q. Or any time in your professional career?

A. I've asked around. Do you use Lams [i.e., laminaria], yes or no. Most everyone I ask has always said, yes.

Q. And these physicians whom you've talked to in that regard, where are they from?

A. Various areas in the country.

Viewed in the light most favorable to appellants, who opposed the motion for judgment, we conclude that, although vague at times, Dr. Girard's testimony was not only admissible at trial but sufficient to permit the jury to find by a preponderance of the evidence that the national standard of care prescribed the use of laminaria for second trimester abortions such as the one performed by Dr. Muangman. *Cf. Travers*, 672 A.2d at 569 (noting that "if there was evidence that the witness had discussed the described course of treatment with practitioners outside the District, such as at seminars or conventions, and that those other practitioners agreed with the course urged, the testimony might have been sufficiently supported since it would have been based upon 'adequate data'" (quoting *Sponaugle*, 411 A.2d at 367)).

## IV. Loss of Consortium Claim

◼ We reject appellant Camacho's argument that the trial court erred in dismissing his claim for loss of consortium on the authority of *Stutsman v. Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc.*, 546 A.2d 367 (D.C.1988). In *Stutsman*, we held that under the governmental interest analysis we apply to questions of choice of law, a similar loss of consortium claim was governed by the law of Virginia, where the married couple resided, because otherwise "Virginia's clearly-expressed intent in regulating the legal rights of married couples domiciled within its borders would be seriously impaired." *Id.* at 376. As Virginia does not recognize a claim for loss of consortium brought by a husband,[9] we held that no such claim could

---

9. As we explained in *Stutsman*, the origins of the Virginia statute, Va.Code Ann. § 55–36 (2010), was "to enlarge the personal rights of married women and to grant them separate legal estates." 546 A.2d at 374. As the statute has been interpreted by courts applying Virginia law, not only may a husband not file suit to recover for his wife's monetary damages, but he also may not sue to recover for loss of consortium. *Id.* at 372. Nor may a wife sue for loss of her husband's consortium. *See Carey v. Foster*, 345 F.2d 772, 778 (4th Cir.1965).

be brought in the District by a plaintiff who resides in Virginia with his wife. *See id.* at 374 (citing additional jurisdictions adopting this interpretation). Appellant Camacho, who resided in Virginia with Ms. Cárdenas when she was treated by Dr. Muangman, argues that *Stutsman* is distinguishable because in that case not only did the plaintiff reside in Virginia, but the alleged negligent act also occurred in the Commonwealth, whereas in this case the tortious act occurred in the District. Appellant Camacho's suggested gloss on *Stutsman*, however, is contrary to the policy we recognized, based on a governmental interest analysis, that holds that "an action for loss of consortium is governed by the law of the state where the marriage is domiciled." *Id.* at 374. "[T]he interest of Virginia is clear. It has an obvious interest in regulating the legal rights of married couples domiciled in Virginia." *Id.* Furthermore, the Virginia statute is "tailored to the specific cause of action here," *id.*, and is "specifically intended to abolish" the claim that Camacho seeks. *Id.* at 375. Although the District may have "strong interest in punishment and deterrence of wrongful conduct causing harm to ... plaintiffs within its borders," *id.* at 374 n. 13 (alteration in original) (quoting *Felch v. Air Florida, Inc.*, 562 F.Supp. 383, 384 (D.D.C.1983)), that interest is satisfied by applying the District's substantive tort law to the wrongful conduct itself, and is less concerned with regulating the rights of married partners in resulting damage awards, *inter sese*, a matter in which Virginia has a superior interest vis à vis its residents than does the District of Columbia. *See Felch*, 562 F.Supp. at 386–87.

■ Finally, Virginia's expressed interest in precluding Camacho's loss of consortium claim is more significant to our governmental interest analysis than is the fact that a Virginia court might apply District of Columbia law (and therefore allow Camacho's claim to proceed) under the conflict of laws analysis used in that state.[10] The "potential interests of the jurisdictions involved," *Stutsman*, 546 A.2d at 374, clearly favor the application of Virginia law under the governmental interests analysis we have adopted, and the difference in application of another jurisdiction's conflict of law rules under a different test does not determine the outcome of our analysis. *See Linnell v. Sloan*, 636 F.2d 65, 66–67 (4th Cir.1980) (applying District of Columbia governmental interest analysis and holding that a D.C. court would apply the law of Maryland, the state with the "stronger interest in the welfare of its married residents," to loss of consortium claim); *cf. Iannello v. Busch Entm't Corp.*, 300 F.Supp.2d 400 (E.D.Va.2004) (applying Virginia choice of law rules to deny loss of consortium claim because tortious conduct occurred in Virginia).[11]

**10.** Virginia applies the *lex loci delicti*, or the law of the place of the wrong, in multi-state tort cases. *See, e.g. McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979); *Miller v. Holiday Inns, Inc.*, 436 F.Supp. 460 (E.D.Va.1977). "The place of the wrong has been defined as 'the state where the last event necessary to make an actor liable for an alleged tort takes place.'" *Miller*, 436 F.Supp. at 462 (E.D.Va.1977) (quoting *Restatement (First) of Conflict of Laws* § 377 (1934)). We have found no decision of the Supreme Court of Virginia or an appellate court of that state involving facts analogous to those presented here; we know of one decision, of the Virginia Circuit Court, applying District of Columbia law to permit a loss of consortium claim by a husband, where the couple resided in Virginia, under the *lex loci delicti* test because the "last event necessary" to make the defendants liable occurred in the District. *See Pringle v. Sloan*, 44 Va. Cir. 516 (1996).

**11.** Under federal transfer statutes, the choice of law provisions of the state of the transferor court apply after transfer if venue was proper in the transferor court, 28 U.S.C. § 1404(a), but not if venue was improper, in which case

Therefore, the trial court properly dismissed the loss of consortium claim.

\* \* \*

We hold that the testimony of Dr. Girard was admissible and sufficient to allow a jury to find the national standard of care on the use of laminaria for the performance of a dilation and evacuation procedure during a second-term abortion. We therefore reverse the grant of judgment as a matter of law for appellees and remand the case with instructions to reinstate the jury verdict for appellants. We affirm the trial court's dismissal of appellant Camacho's claim of loss for consortium.

*So ordered.*

the law of the transferee forum applies. 28 U.S.C. § 1406(a). *Linnell* was decided under § 1404(a), *see* 636 F.2d at 66, and *Iannello* was decided under § 1406(a), *see* 300 F.Supp.2d at 403.